*667 OPINION OF THE COURT
Richard Rivera, J.
NATURE OP THE CASE
This case involves a dispute regarding the scope of insurance coverage applicable to plaintiff’s car on the date of a car accident that left his car a total loss. Plaintiff claims that he had comprehensive insurance coverage on the date of the accident that covered the loss. His insurer, defendant Colonial Penn (Penn), claims that plaintiff was only covered by liability insurance on the date of the accident and has denied comprehensive coverage.
Defendant Josué Gilot, a licensed independent insurance broker, supports plaintiff’s contentions. Specifically, he claims that Penn was plaintiff’s insurer under New York’s Assigned Risk Insurance Plan (Insurance Law § 5301 et seq.) having issued a liability insurance policy to plaintiff before the accident in question, that Gilot mailed Penn a change in coverage form four days before the accident to change plaintiff’s coverage from liability to comprehensive coverage, that plaintiff paid the required premium to Gilot for the added coverage, and that this payment bound Penn to provide comprehensive coverage since, under the circumstances of this case, Gilot was Penn’s "agent” for this transaction. Penn acknowledges receiving the change in coverage form that Gilot mailed but insists that it received the form two days after the accident. Penn denies both that Gilot was its agent in this transaction and that he could bind Penn to provide the additional coverage.
Caught between this cross-fire of charges and counter-charges, plaintiff, who appeared pro se in this action, named both Penn and Gilot as defendants. Penn has cross-claimed against Gilot for indemnification in the event it is found liable to plaintiff.
The principal questions before the court are whether Penn must honor plaintiff’s insurance claim for the damage to his car, and, if so, whether Gilot must indemnify Penn for any judgment against it.
FACTUAL BACKGROUND
In or about June 1989, plaintiff purchased a 1984 BMW 320-1. On June 8, 1989, he applied for comprehensive car insur *668 anee through defendant Gilot. Since plaintiff had not yet received the official certificate of title for his car, Gilot told him he could only purchase liability car insurance which insured him against claims for bodily injuries resulting from any car accident in which plaintiff might be involved.
Gilot prepared and submitted a liability insurance application on plaintiff’s behalf to the New York Automobile Insurance Plan (the assigned risk pool) which is currently governed by Insurance Law § 5301 et seq. This statute requires all insurers licensed to write motor vehicle insurance in New York State to subscribe to and participate in an assigned risk insurance plan approved by the New York State Superintendent of Insurance for the "equitable apportionment among such insurers of applicants for such insurance who are in good faith entitled to but are unable to procure [motor vehicle insurance] through ordinary methods.” (Insurance Law § 5301 [a].) An entity called the New York Automobile Insurance Plan (NYAIP) was created to administer the assigned risk plan, and it has promulgated rules which govern the plan (hereafter Plan Rules). The New York State Superintendent of Insurance has approved the Plan Rules.
Following the Plan Rules procedure, NYAIP assigned an insurer for plaintiff after receiving his application. This turned out to be Penn which issued liability insurance for plaintiff’s car effective June 10, 1989 through June 10, 1990. Penn mailed a copy of the policy either directly to plaintiff or to Gilot for redelivery to plaintiff, and plaintiff produced this policy at trial.
Thereafter, on June 23, 1989 plaintiff returned to Gilot to buy comprehensive insurance coverage since by this time he had received the certificate of title for his car. Pursuant to article 15-A (3) of the plan, Gilot filled out a change of coverage form and mailed it directly to Penn by regular mail since, according to the Plan Rules, Penn would continue to be plaintiff’s insurer on the revised policy. At that time, plaintiff paid the required premium to Gilot who testified that Penn routinely authorized him to accept such payments on its behalf. As will be discussed shortly, there is a dispute as to when Gilot mailed the change in coverage form. Gilot claims he prepared it on June 23, 1989 and mailed it on June 24, 1989 while Penn insists he mailed it on June 29, 1989.
On June 28, 1989, plaintiff’s car was involved in a collision that resulted in a total loss. Plaintiff immediately reported the *669 accident to Gilot on June 28, 1989, and Gilot reported all necessary information to Penn on the same day. On July 12, 1989, Penn informed plaintiff that its adjuster had inspected the car and declared it a total loss. Penn also informed plaintiff that it had tried but been unable to remove the car from the garage "as per policy condition.” Penn also asked plaintiff to send it a copy of the MV-104 accident report. Plaintiff argues that these actions contradict Penn’s subsequent assertion that he was not covered by a comprehensive policy.
To plaintiff’s surprise, Penn wrote him again on July 19, 1989 to say it would not cover his loss on the ground that his comprehensive insurance policy had not been approved until June 30, 1989, i.e., two days after the accident. Plaintiff immediately went to Gilot who called Penn and told its claims department that plaintiff had comprehensive coverage since June 23, 1989. When Penn refused to honor the claim, Gilot filed a written complaint with the Superintendent of Insurance on July 19, 1989 claiming that Penn was wrongfully denying coverage on plaintiff’s valid claim. Citing article 15-A of the plan, Gilot argued that his mailing of the change of coverage form to Penn on June 24, 1989 bound Penn to extend comprehensive coverage for plaintiff’s car effective on 12:01 a.m. of June 25, 1989, i.e., three days before the accident.
On July 25, 1989, Penn provided a further ironic twist to these developments by informing plaintiff that it was suspending his comprehensive insurance which it claims had been in effect since June 30, 1989 because he had failed to have the car inspected by July 6, 1989. Of course, Penn knew both on July 6, 1989 and July 25, 1989 that plaintiff’s car had been demolished since June 28, 1989.
By letter dated August 23, 1989, Penn responded to Gilot’s complaint filed with the Superintendent of Insurance. It argued that Gilot mailed the change of coverage on June 29, 1989 (i.e., after the accident) by regular mail, and that Penn did not receive it until June 30, 1989 as evidenced by the "clock-in” time stamped on its copy of the form. Accordingly, Penn argued that it could only be bound to provide comprehensive coverage effective June 30, 1989. At trial, Penn explained that under the Plan Rules, it was bound to provide a requested change in coverage effective at 12:01 a.m. of the day following the postmark date appearing on a change of coverage request only if the request is mailed by certified mail. Otherwise, the change in coverage becomes effective when it is *670 "clocked-in” by the insurer. It strenuously opposed Gilot’s assertion that he could bind Penn on the comprehensive policy effective June 24, 1989.
Contrary to their July 19, 1989 letter to plaintiff and their August 23, 1989 representations to the Superintendent of Insurance, however, Penn wrote to plaintiff on August 30, 1989 to inform him that his insurance claim was still "open,” and that it was still investigating it. And, on September 26, 1989 Penn again wrote to Gilot asking for further details about the accident from plaintiff thereby indicating that his claim for insurance coverage for the June 28, 1989 accident was still active. When it wrote this last letter, however, Penn already knew that on September 7, 1989, the Superintendent of Insurance had denied plaintiff’s complaint against Penn, sustained Penn’s denial of comprehensive coverage, and informed plaintiff that he would have to pursue his claims through litigation. Subsequently, plaintiff filed this pro se action.
Whether plaintiff is entitled to comprehensive coverage depends on whether his premium payment to Gilot on June 23, 1989 bound Penn to provide the coverage. Penn argues that independent "brokers” like Gilot are "agents” of the person applying for insurance (i.e., the insured) and cannot bind the insurer. Plaintiff and Gilot argue that the payment to Gilot constituted payment to Penn and triggered comprehensive coverage for plaintiff as of the date of the payment, i.e., June 23, 1989.
For the reasons that follow, I find that plaintiff’s premium payment to Gilot constituted payment to Penn and found it to provide comprehensive coverage effective June 23, 1989.
DISCUSSION
A. Legal Principles
The courts of this State have historically held that insurance brokers are deemed to be agents of the insured and not the insurer. (Bohlinger v Zanger, 306 NY 228 [1954]; Jet Setting Serv. Corp. v Toomey, 91 AD2d 431 [1st Dept 1983]; County of Monroe v Hanover Ins. Co., 73 AD2d 1036 [4th Dept 1980]; Wilber v Williamsburgh City Fire Ins. Co., 122 NY 439 [1890].) This well-settled common-law rule has been codified in the Insurance Law of this State for some time. Currently, it is stated in Insurance Law § 2101 (c) which defines an insurance broker as any person, firm, association, or corporation who for *671 any compensation solicits, negotiates, or procures insurance "on behalf of an insured other than [her/] himself or itself’. By contrast, an insurance agent is "any authorized or acknowledged agent of an insurer * * * who acts as such in the solicitation of, negotiation for, or procurement or making of, an insurance * * * contract, other than as a licensed insurance broker”. (Insurance Law § 2101 [a].)
Although the distinction between an insurance broker and insurance agent is an important one in determining whether the broker/agent’s acts bind the insured, insurer, or both, the mere label is not conclusive of the nature of the relationship which he or she occupies. (Caccamise v Metropolitan Cas. Ins. Co., 252 App Div 521, 525 [4th Dept 1937].) Ultimately, the acts of the person and not the label determines the category into which he/she falls and who is bound by those acts. (Friedman v Markman, 11 AD2d 57 [1st Dept 1960].) Thus, for example, notwithstanding the general rule that a broker’s acts bind the insured and not the insurer, it was well settled at common law that when an insurance company entrusted its policies to a "broker” for delivery to an insured, the broker was acting as "agent” for the insurer in collecting and receiving the premium. In these situations, payment of the premium to the broker was deemed payment to the insurer. (Bohlinger v Zanger, supra, at 232, 235-236, and cases cited therein; Lezak v National Grange Mut. Ins. Co., 233 NYS2d 607, 608 [Sup Ct, Kings County 1962], and cases cited therein.)
This rule, too, has been codified for some time in this State. In a 1939 revision of New York’s Insurance Law, for example, the Legislature enacted Insurance Law § 121 which provided that "Any insurer which delivers in this state to any insurance broker a contract of insurance pursuant to the application or request of such broker, acting for an insured other than himself, shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery or which becomes due thereon in not more than ninety days thereafter.” (Emphasis supplied.) The purpose of this statute was to reflect " 'the general custom of the community * * * that payment to the broker constitutes payment to the insurer’ ”. (Bohlinger v Zanger, supra, at 236 [Fuld, J., dissenting].) In sponsoring the 1939 statutory revision, the New York Insurance Department explained that section 121 " 'is based upon general principles of the law of agency, as the possession of the policy gives the broker an implied authority *672 to receive the premium’ ” as the agent of the insurer. (Supra, at 236, n 1; Standard Acc. Ins. Co. v Roth, 28 Misc 2d 1080, 1082 [Sup Ct, NY County 1961].) Ultimately, the legislative aim behind section 121 as manifested in committee notes, hearings, and legislative reports was "to relieve the insured from all risks stemming from a broker’s possible dishonesty or insolvency.” (Bohlinger v Zanger, supra, at 237 [Fuld, J., dissenting].) With this remedial purpose in mind, it has been held that section 121 created a conclusive rather than rebuttable presumption of agency thereby removing any question regarding the payment of the required premium to the insurer. (Central Sur. & Ins. Corp. v Marro, 189 Misc 823, 826-827 [Sup Ct, Rensselaer County 1947].)
The agency thus created is not open-ended. It does not, for example, authorize brokers to reinstate canceled policies or extend the time to pay premiums (Standard Acc. Ins. Co. v Roth, supra, at 1082-1083). The practical effect of the agency is to vest the broker with the authority to act for the insurance company "in connection with receipt of premium, installment premium or additional premiums which become due or payable.” (Supra, at 1082.) In this regard, the 90-day provision in section 121 did not operate to extend the time to pay premiums nor did it grant the broker authority to reinstate canceled policies. Instead, "it is simply a limit on the time within which a broker may receive moneys that become due and payable to an insurance company.” (Supra, at 1083.)
In 1984, the State Legislature amended section 121 as part of a general recodification of the Insurance Law and renumbered it as section 2121 (a). Although section 2121 (a) is substantially identical to former section 121, it contains a significant change. Specifically, section 2121 (a) provides that an insurer makes a broker its agent for the purpose of receiving premiums on its behalf where it delivers the policy to either the broker "or any insured represented by such broker”. Today, therefore, delivery of an insurance policy either to the broker or the insured represented by the broker authorizes the broker to accept premium payments on behalf of the insurer. As Insurance Law § 2121 (b) makes clear, this rule applies to insurance policies issued pursuant to, among others, article 53 of the Insurance Law, i.e., the assigned risk pool.
B. Application of Legal Principles
With these principles in mind, it is apparent that Gilot was *673 Penn’s "agent” for the payment of premiums due on the plaintiffs assigned risk policy. There is no question that Penn delivered the policy either directly to the plaintiff or to Gilot for redelivery to the plaintiff. By this act, Penn authorized Gilot to accept plaintiffs premium payments on its behalf, and it is therefore estopped from denying such payments (Insurance Law § 2121 [a]). Penn’s argument that Gilot, as a broker, was plaintiff’s and not Penn’s agent is therefore incorrect with respect to plaintiff’s June 23, 1989 premium payment on the comprehensive insurance policy.
Penn argues, however, that under the Plan Rules of the NYAIP, plaintiff was not entitled to comprehensive coverage on his car until June 30, 1989, i.e., two days after the accident. In support of this contention, Penn relies upon section 11 (B) (3) of the Plan Rules. This rule provides that an insured who desires to add physical damage coverage on a motor vehicle which is presently insured under an automobile liability policy issued through the NYAIP must submit such a request directly to the previously assigned liability insurer. Section 11 (B) (3) also provides that "The physical damage coverage requested shall be effective as of 12:01 A.M. on the day of receipt of the request in the office of the insurer unless the request was submitted by certified mail. If the request is submitted by certified mail * * * the physical damage request shall be effective 12:01 A.M. on the day following the postmark date on the transmittal envelope as affixed by the United States Postal Service.” There is no claim here that Gilot sent plaintiff’s change of coverage request to Penn by certified mail. The only evidence in the record on this point is a regular mail envelope produced by Penn to support its claim that Gilot mailed the change in coverage form on June 29, 1989, a day after the accident. After closely examining the postmark, the court concludes that the postmark is unclear and illegible since it is possible to read the date as either June 25, June 26, June 28, or June 29. In these circumstances, section 11 (G) of the Plan Rules applies. That section provides that "If the postmark is illegible, is a metered mail postmark, or if the request for coverage was not submitted by certified mail, the applied for coverage shall be effective 12:01 A.M. on the day of receipt of the request in the office of the insurer.”
Penn urges that sections 11 (B) (3) and 11 (G) of the Plan Rules clearly support its claim that plaintiff’s comprehensive coverage went into effect on June 30, 1989, the day it stamped *674 the change in coverage form as received. But these rules must be read in light of Insurance Law § 2121 (a). As previously noted, Gilot was Penn’s agent for the payment of premiums on plaintiff’s car insurance policy, and premium payments to Gilot are conclusively presumed to be payments to Penn. The rigid interpretation that Penn urges with respect to sections 11 (B) (3) and 11 (G) of the Plan Rules ignores the operation of Insurance Law §2121 (a) in this case, and would strip that statute of its plain meaning and undermine its remedial purposes. In this regard it is well settled that administrative agency rules and regulations that are out of harmony or contravene statutory enactments are invalid and unenforceable. (Matter of Jones v Berman, 37 NY2d 42, 53 [1975]; New York State Health Facilities Assn. v Axelrod, 155 AD2d 208, 213 [3d Dept 1990]; Thorgeirsdottir v New York City Loft Bd., 161 AD2d 337, 339 [1st Dept 1990].) The more appropriate reading of sections 11 (B) (3) and 11 (G) is that insurance coverage commences either on the certified mail postmark date or receipt stamp date where the mailing is by regular mail unless the insurer is otherwise bound to acknowledge earlier coverage, e.g., as a result of payment to a broker under the circumstances envisioned by section 2121 (a). This reading harmonizes the respective purposes of the Plan Rules and Insurance Law § 2121 (a), and makes practical as well ás legal sense.
Nevertheless, Penn has further argued that Gilot cannot bind it to provide additional or different coverage not contained in plaintiff’s liability policy. This argument, too, is based on Gilot’s status as a "broker.” As previously noted, the dispositive inquiry is not the label attached to Gilot’s actions in these transactions but the underlying facts and circumstances that clarify his legal relationship to both plaintiff and Penn. (Caccamise v Metropolitan Cas. Ins. Co., 252 App Div 521, supra.)
It is undisputed that plaintiff paid Gilot $400 on June 23, 1989 partly as a premium for the addition of comprehensive insurance coverage to his existing liability policy and partly to cover Gilot’s brokerage fee. Gilot testified without contradiction that Penn cashed the check, and Penn concedes that plaintiff’s car qualified for comprehensive coverage which it added to plaintiff’s existing policy on June 30, 1989. Pursuant to the Plan Rules, these transactions did not constitute a new application for insurance which would have had to be submitted to the NYAIP for the assignment of a new insurer under *675 section 11 (A) of the Plan Rules. Rather, the June 23 transactions were for added coverage to the existing liability policy issued by Penn. Indeed, the policy number on the comprehensive policy that Penn issued to plaintiff is the same policy number on the liability policy. Under these circumstances, plaintiff and Gilot correctly negotiated directly with Penn, the insurer already assigned to plaintiff by the NYAIP for all car insurance purposes.*
In this regard, it has been held that "assigned risk insurance applications and policies cannot be viewed as private, contractual relationships, but are special relationships subject to immediate oversight and supervision of the Superintendent of Insurance.” (Matter of Bowley Assocs. v State of New York Ins. Dept., 98 AD2d 521, 526-527 [1st Dept 1984].) Accordingly, the acceptance of a risk under the NYAIP is " 'a matter of duty enforced by law rather than of voluntary relationship with the broker’ ”. (Panepinto v Allstate Ins. Co., 108 Misc 2d 1079, 1081 [Sup Ct, Monroe County 1981]; Aetna Cas. & Sur. Co. v O’Connor, 8 NY2d 359, 362-363.) Consequently "it cannot be said that the [assigned risk] insurer would not have accepted the risk had it known its true nature because the insurer is constrained by the plan to accept its share of the assigned risks, all of which are presumably poor.” (Panepinto v Allstate Ins. Co., supra, at 1081.)
In view of these principles, Penn’s assertion that Gilot could not bind it to provide comprehensive coverage on plaintiff’s existing liability policy misses the point. It was the provisions and nature of the NYAIP — not Gilot — which bound Penn to provide comprehensive coverage to the plaintiff. This was not a matter of choice or negotiation since Penn was bound to extend comprehensive coverage to plaintiff’s car even though plaintiff was presumably a poor risk. (Panepinto v Allstate Ins. Co., supra.) As a matter of fact, Penn conceded that it approved comprehensive coverage for plaintiff’s car on June 30, 1989.
So, in truth, the relevant question is when this coverage became effective. For the reasons already stated, I hold that comprehensive coverage on plaintiff’s car became effective on June 23, 1989 when he paid Gilot, Penn’s agent for the *676 acceptance of premium payments under the existing policy. The fact that Penn issued the policy on June 30, 1989 does not, under the facts of this case, alter the effective date of plaintiff’s comprehensive policy coverage. It has been held that payment of an insurance premium before the actual issuance of the policy constitutes payment within the meaning of Insurance Law § 121 (now Insurance Law § 2121 [a]) and triggers coverage under the yet-to-be issued policy. (Globe Indem. Co. v Gilligan, 73 Misc 2d 27, 28 [Dist Ct, Suffolk County 1973].) Thus, plaintiff’s payment to Gilot triggered comprehensive insurance coverage as of June 23, 1989, and Penn could not disclaim coverage with respect to the June 28, 1989 accident. Penn must therefore cover plaintiff’s loss.
While plaintiff claims that his car was worth $12,000 at the time of the accident, his only proof is a letter submitted by the garage that stored his car after the accident. This letter alone is an insufficient basis on which to base the value of the car. Accordingly, Penn is hereby directed to determine the reimbursable value of plaintiff’s car as of the date of the accident and inform plaintiff of such value. Since Penn’s adjuster inspected the car on or about July 12, 1989, it should have sufficient records on which to base its valuation. All parties are directed to appear before me on August 19, 1991 to report on the status of plaintiff’s claim by that date. Lastly, given this decision, Penn’s third-party complaint against Gilot is dismissed since Penn has not demonstrated that Gilot was negligent or exceeded his authority in any way.

Had Penn been a "liability-only company,” plaintiff and Gilot would have had to submit the change in coverage request to the NYAIP for assignment of an appropriate insurer. (Plan Rules § 11 [B] [4].) Since this was not the case, plaintiff and Gilot properly requested added coverage directly from Penn. (Plan Rules § 11 [B] [3].)