ANGLO AMERICAN INSURANCE GROUP, P.L.C. and Anglo American Insurance Holdings Limited, Plaintiffs,

v.

CALFED, INC., XCF Acceptance Corporation, as successor by merger to Calfed, Inc., and William J. FITZPATRICK, Defendants.

William J. FITZPATRICK,
Third–Party Plaintiff,

v.

ANGLO AMERICAN INSURANCE COMPANY LIMITED, Third–Party Defendant.

CALFED, INC. and XCF Acceptance Corporation, as successor by merger to Calfed, Inc., Third–Party Plaintiffs,

v.

KPMG Peat Marwick McLINTOCK,
Third–Party Defendant.

No. 92 Civ. 9137(RLC).

United States District Court,
S.D. New York.

Aug. 25, 1995.

Stroock & Stroock & Lavan (Alvin K. Hellerstein, Brian M. Cogan, Alan Z. Yudkowdky, of counsel), New York City, for Third–Party Plaintiffs.

Morgan, Lewis & Bockius (Laurie E. Foster, James M. Conway, of counsel), New York City, for Third–Party Defendants.

ROBERT L. CARTER, District Judge.

Third-party defendant Anglo American Insurance Company Limited ("Anglo") moves pursuant to Rules 12(b)(2) and 12(b)(6), F.R.Civ.P., to dismiss the third-party complaint brought by third-party plaintiff William J. Fitzpatrick.

## I.

On October 10, 1989, defendant CalFed Inc. ("CalFed") entered into an agreement to sell 100% of the stock of Anglo, an English insurance company, to plaintiff Anglo American Insurance Group P.L.C. (then called Mazard P.L.C.). Before the closing, Anglo American Insurance Group P.L.C. assigned its rights under the agreement to its wholly-owned subsidiary, plaintiff Anglo American

Insurance Holdings Limited (then called Magister Agency Investments Limited), which purchased the shares at the closing on February 6, 1990.

Plaintiffs bring the main action in this case against CalFed; XCF Acceptance Corporation, as successor by merger to CalFed; and Fitzpatrick, an executive vice-president of CalFed who was a director of Anglo until the February, 1990 closing. Plaintiffs bring breach of warranty and contract claims against CalFed in connection with the sale of Anglo. In addition, plaintiffs bring negligent misrepresentation claims against CalFed and Fitzpatrick on the grounds that at the closing CalFed and Fitzpatrick reaffirmed representations and warranties contained in the purchase agreement, that the reaffirmations were incorrect and misleading, and that CalFed and Fitzpatrick failed to disclose material facts. In the instant third-party action, Fitzpatrick alleges that as a director of Anglo he is entitled to indemnification to the extent that he is found liable on plaintiffs' negligent misrepresentation claim.

## II.

This court has not held an evidentiary hearing regarding personal jurisdiction, and Fitzpatrick has not had an opportunity to conduct discovery regarding personal jurisdiction. Therefore, Fitzpatrick must merely make out a prima facie case that personal jurisdiction over Anglo exists. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55 (2d Cir.1985). The court will construe the facts in the light most favorable to Fitzpatrick and resolve all doubts in his favor. *Id.*

■■■ A federal court sitting in diversity determines its personal jurisdiction over a defendant according to the law of the state in which the court sits. *Id.* at 57. This court has personal jurisdiction over a foreign corporation under N.Y.Civ.Prac.L. & R. ("CPLR") 301 (McKinney 1990) where the defendant "is engaged in such a continuous and systematic course of 'doing business' [in

New York] as to warrant a finding of its 'presence' in this jurisdiction." *Laufer v. Ostrow,* 55 N.Y.2d 305, 309–10, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982) (quoting *McGowan v. Smith,* 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d. 321 (1981)). A foreign corporation will be found to be doing business in New York where there is a relationship between that corporation and a New York corporation leading to an inference of agency, *Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 538, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967), *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967), or where

> a separate corporation, acting with its authority and for its substantial benefit, carries out activities in New York that are more than 'mere solicitation' and are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'

*Volkswagen De Mexico, S.A. v. Germanischer Lloyd,* 768 F.Supp. 1023, 1027 (S.D.N.Y. 1991) (Cedarbaum, J.) (quoting *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 121 (2d Cir.1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968)). Here, plaintiff alleges that Anglo, a foreign corporation, is subject to personal jurisdiction in New York because of its relationship with New York excess line brokers.[1] There is no allegation of common ownership between Anglo and its purported agents. Therefore, the first prong of the test is whether New York excess line brokers act with the authority and for the benefit of Anglo.

As Anglo stresses, New York excess line brokers usually act as agents of their insureds, *Augustin v. Gilot,* 152 Misc.2d 666, 670–71, 578 N.Y.S.2d 348 (Civ.Ct.1991), *rev'd on other grounds,* 158 Misc.2d 627, 606 N.Y.S.2d 514 (App.Term.1993), and they do not have the authority to bind Anglo to agree to underwrite a policy. New York excess

---

1. Defendant asserts that the issue of personal jurisdiction over London excess line brokers was settled in the case of *Landoil Resources Corporation v. Alexander & Alexander Services, Inc.,* 77 N.Y.2d 28, 563 N.Y.S.2d 739, 565 N.E.2d 488

(1990). However, the New York Court of Appeals did not consider whether New York excess line brokers act as agents for London insurers and whether, as a result, New York has jurisdiction over the insurers.

line brokers receive requests for insurance and then contact a London broker. The London broker then solicits London insurers to underwrite the policy. (Mitchell Aff. ¶ 6.) Anglo is free to accept or deny coverage of the policy, and the actions of the excess line brokers in soliciting potential policyholders have no binding effect on Anglo.

■ Fitzpatrick points out, however, that London insurers often rely upon their New York brokers to prepare and process policy documents, to obtain information that insurers need in order to assess liability and decide what claims to cover, and to collect and remit premiums and losses. (Latza Aff. ¶ 18.) Although there is no evidence before the court regarding the extent to which Anglo relies upon brokers to perform such tasks, New York law requires insurers to authorize brokers to collect premiums due on insurance contracts that the brokers solicited. N.Y.Ins.Law § 2121 (McKinney 1985). Whenever the brokers collect premiums, they are deemed to be acting under the authority of the insurance company so long as a contract that they solicited is in effect and the broker receives the payment within ninety days after its due date. N.Y.Ins.Law § 2121 (McKinney 1985); *see also Bohlinger v. Zanger,* 306 N.Y. 228, 230, 117 N.E.2d 338 (1954) (discussing "dual agency status of an insurance broker"). Thus, New York excess line brokers act under the authority and for the benefit of Anglo, satisfying the first prong of the test.

Furthermore, without the activities of the brokers Anglo would have difficulty preparing and processing policy documents, acquiring information about prospective policyholders in order to assess the risks that they present, and collecting premiums from New York policyholders. The excess line industry specializes in covering unique and specialized risks. (Latza Aff. ¶ 8; *see also* Fitzpatrick Documentary App. Ex. A at 4.) Fundamental to this coverage is " 'freedom of rate and form'—the flexibility to set premiums to reflect the true exposure and coverage and to create and tailor a policy to meet the specific needs of the insured." (Fitzpatrick Documentary App. Ex. A at 3.) In order to perform this discretionary underwriting, in-

surers must obtain extensive information about the prospective policyholders and must be confident of the truth and completeness of this information. (Latza Aff. ¶ 8.) According to Fitzpatrick's attorney, "Most excess line insurers, and London Insurers especially, would prefer to place their confidence in the underwriting support provided by professional licensed brokers in the form of full and accurate disclosure of all material information relative to the subject of the insurance." (*Id.* ¶ 8.) Thus, the services that the brokers regularly perform go beyond mere solicitation and "are an essential part of the conduct of defendant's business," *Tuxxedo Network, Inc. v. Hughes Communications Carrier Servs., Inc.,* 753 F.Supp. 514, 517 (S.D.N.Y. 1990) (Cedarbaum, J.), satisfying the second prong of the test.

Fitzpatrick avers that the services performed by excess line brokers are so important that if their services were not available Anglo would have to perform their role itself. Anglo argues that Anglo could not take over the tasks of excess line brokers because insurance brokerage and underwriting are completely different and because excess line insurance is rarely written without a broker. This dispute misses the point of the test, which is the importance of the agents' services to the principal, not the feasibility of the principals' performing the agents' role. *Gelfand,* 385 F.2d at 121 (holding that test is whether services provided by New York representative "are *sufficiently important to the foreign corporation* that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services") (emphasis added). The fact that excess line insurance is rarely written without a broker's aid is precisely the point—brokers are an integral part of the underwriters' business. Furthermore, Anglo does not deny that excess line insurers sometimes do sell insurance directly to insureds, demonstrating that the underwriters could perform at least some aspects of brokers' jobs.

Evidence that Anglo purposely avails itself of the New York insurance market can be found in the measures it takes to comply with New York regulations and guidelines regard-

ing excess line insurers.[2] In order to do business with New York excess line brokers, unauthorized foreign insurers must provide their most recent financial statements to excess line brokers for inspection by insureds, N.Y.Comp.Codes R. & Regs. ("NYCRR") tit. 11, § 27.5(a)(1) (1993), and annually file Form EL–1 with the New York State Insurance Department, indicating the value of their New York premiums for the previous year. NYCRR tit. 11, § 27.6(d) (1993). They must maintain a $1,500,000 trust fund in a New York bank or a member of the Federal Reserve Bank, NYCRR tit. 11, § 27.5(a)(1)(ii)(b) (1993), and they must submit to the jurisdiction of the New York courts in any action instituted by an insured arising out of a policy issued by the unauthorized insurer. NYCRR tit. 11, § 27.6(b) (1993). As of 1993, Anglo apparently maintained a trust fund of $3,504,760 in New York state, (Latza Aff. ¶ 11), and Anglo filed Form EL–1 in 1988, 1989, 1990, 1991 and 1992. (Fitzpatrick Documentary App. Ex. C.) Anglo's compliance with the remaining regulations can be deduced from the facts that it conducts business with New York excess line brokers and that the Excess Line Association of New York ("ELANY") has verified that Anglo "meet[s] the standards of eligibility imposed by Section 2118 of the Insurance Law and departmental Regulation 41 [encompassing all of the insurance regulations mentioned above]." (*Id.*)

Thus, Anglo continuously demonstrates its desire to do business in New York state by, among other things, purposefully filing annual financial statements with the New York state government and with each New York excess line broker with which it deals and by maintaining a sizeable trust fund in New York. "A non-domiciliary corporation's efforts to comply with governmental requirements for doing business here are some indication of the corporation's intent to avail itself of the privilege of transacting business in New York." *GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F.Supp. 763, 770 (W.D.N.Y.1991); *see also Wichita Fed. Sav. & Loan Ass'n v. Comark*, 586

F.Supp. 940, 944 (S.D.N.Y.1984) (Lasker, J.) (filing of certificate of authority to do business illustrated defendant corporation's intent to conduct business in New York), *aff'd*, 810 F.2d 1161 (2d Cir.1986). Anglo calls the court's attention to the opinion of the New York Court of Appeals in *Landoil Resources Corporation.* In that case, the court found the facts that Lloyd's of London had established a trust fund in New York in 1940 to protect United States policyholders during World War II and that the trust fund happened to satisfy the New York insurance regulations insufficient to establish that a syndicate of underwriters belonging to Lloyd's was doing business in New York. *Landoil Resources Corp.*, 77 N.Y.2d at 35–36, 563 N.Y.S.2d 739, 565 N.E.2d 488. The court noted that "[w]hether Lloyd's would, in the absence of such a fund, establish something similar in its place which might support jurisdiction, is entirely speculative." *Id.* at 36, 563 N.Y.S.2d 739, 565 N.E.2d 488. The court did not address the other steps, if any, that the Lloyd's syndicate had taken to comply with New York insurance regulations. The court also warned that to base jurisdiction over the Lloyd's syndicate solely on the trust fund "would subject any foreign insurer to suit in New York merely because of the existence of a security fund." *Id.* at 37, 563 N.Y.S.2d 739, 565 N.E.2d 488. In the instant case, Fitzpatrick has shown more than the existence of a trust fund, and the deliberate steps that Anglo takes to comply with the regulations, taken together with its delegation of authority to excess line brokers, show that Anglo is purposefully doing business in New York.

■ Asserting jurisdiction over Anglo comports with the requirements of due process because Anglo's contacts with New York are substantial. *International Shoe Co. v. Washington*, 326 U.S. 310, 319–20, 66 S.Ct. 154, 159–60, 90 L.Ed. 95 (1945). It is not irrelevant in this context that in 1988 Anglo collected $22,808,630 in insurance premiums through 55 New York excess line brokers; in 1989 it collected $117,985,238 through 224

---

**2.** The relevant regulations were amended in December 1993; this opinion will cite to the regulations as they existed during the transaction at issue in this case, which was prior to that amendment.

New York excess line brokers; and in 1990 it collected $8,592,520 through 44 New York excess line brokers. (Fitzpatrick Doc.App. Ex. B.) Because the court has personal jurisdiction over Anglo as a result of the business that Anglo does in New York, the court need not reach Fitzpatrick's contention that jurisdiction also exists pursuant to CPLR 302.

### III.

■ Anglo moves to dismiss Fitzpatrick's third-party complaint pursuant to Rule 14(a), F.R.Civ.P., under which a defendant may implead a third party "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Rule 14(a), F.R.Civ.P. The purpose of the rule is to promote judicial economy and to protect the resources of the parties. *Consolidated Rail Corp. v. Metz*, 115 F.R.D. 216, 219 (S.D.N.Y.1987) (Kram, J.). A district court, which possesses considerable discretion in deciding whether impleader is warranted, should consider four factors in making its determination: "(1) whether the movant deliberately delayed or was derelict in filing its motion; (2) whether prejudice will result to the third party defendant; (3) whether the trial of the principal action would be delayed or unduly complicated; and (4) whether the proposed third party complaint states a claim under which relief may be granted." *Id.* at 218–19. Anglo does not aver that the third-party complaint was filed in an untimely manner or that permitting impleader would in any way delay the trial of the main action.

Anglo warns that if the impleader complaint proceeds, Anglo will be prejudiced because the jury "may possibly be inappropriately influenced in its verdict on [plaintiffs'] claim, especially since [plaintiffs are] the owner[s] of Anglo." (Anglo Am. Ins. Co. Mem. in Support of Mot. to Dismiss 3d–

Party Compl. at 25.) This forecast, which does not include a prediction about the manner in which the jury might be influenced, is too vague to persuade the court to exercise its discretion to dismiss the impleader complaint.

Anglo argues that the trial of the main action will be complicated by the impleader of Anglo. First, Anglo claims that inclusion of Anglo will multiply the issues, thus confusing and distracting the jury. Central to both the main action and the third-party action is the question whether Fitzpatrick made negligent misrepresentations during the sale of Anglo. Of course, addition of the third-party action will add the issues of (1) when, under English law and the terms of Anglo's articles of incorporation, Fitzpatrick would be entitled to indemnification and (2) whether Fitzpatrick has fulfilled those conditions. The first issue is primarily one of law, and as the court makes determinations of law there is no danger that allowing the issue into the case will unduly confuse the jury.[3] The second issue will present a number of determinations of fact for the jury to make. As the court has not yet decided under what conditions the articles of incorporation entitle Fitzpatrick to indemnification, *see* discussion *infra* p. 1081, it is not possible to know exactly what questions the jury will have to decide. However, it seems fair to predict that the primary question will be whether Fitzpatrick made the contested representations while executing his duties for Anglo. "Rule 14 does not require that the facts and legal issues in the third-party claim be completely identical to those in the main action." *Argonaut Ins. Co. v. Halvanon Ins. Co.*, 545 F.Supp. 21, 23 (S.D.N.Y.1981) (Werker, J.). The similarity of the facts underlying the third-party and main actions convinces the court that impleader would serve the interests of judicial economy. The court notes

---

3. The parties agree that this case is one of first impression. (*See* Grierson Aff. ¶ 4; Taylor Aff. ¶ 14.) Anglo argues that the court should therefore refuse to entertain the third party complaint. Anglo insists that "[w]here, as here, resolution of a third-party complaint necessarily involves deciding difficult foreign law issues, the court has discretion to refuse to allow the third-party complaint." (Anglo Reply Mem. in Supp. of Mot. to Dismiss 3d Party Compl. at 19.) However, courts are quite capable of deciding questions of foreign law, *see, e.g., Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727, 737 (S.D.N.Y.1986) (Tenney, J.) ("It is clearly within the authority of the court to interpret and apply a foreign statute."), even when that law is unsettled, and the court does not find this to be a reason for denying impleader.

that if, at a later stage in the proceedings, it finds that trying the main and third-party actions together would complicate matters and distract the jury, the court can sever the actions for the purposes of trial. *Id.* at 23 n. 1.

Anglo warns that if impleader is permitted, Anglo will be forced to bring any counterclaims that it may have against Fitzpatrick. Anglo does not, however, state whether there are in fact grounds to support counterclaims or what those counterclaims might be, so the court can hardly rely on this as a basis for its decision. Anglo also contends that judicial economy would be served by dismissal because if Fitzpatrick is found liable to the plaintiffs he will not be entitled to indemnification. However, the court has not yet determined under what conditions Fitzpatrick might be entitled to indemnification, so this argument is premature.

█ Anglo's final argument is that English law and Anglo's articles of incorporation do not permit Anglo to indemnify Fitzpatrick for any liability that he might be found to have to plaintiffs. Where there is no basis for holding the third-party defendant secondarily liable to the third-party plaintiff, impleader is inappropriate. *Index Fund, Inc. v. Hagopian,* 417 F.Supp. 738, 743 (S.D.N.Y. 1976) (Tenney, J.). Fitzpatrick, who was a director of Anglo at the time of the sale of Anglo, seeks indemnification from Anglo pursuant to Article 13(a) of Anglo's Articles of Association, which reads:

> Every Director or other officer of the Company shall be indemnified out of the assets of the Company against all losses or liabilities which he may sustain or incur in or about the execution of the duties of his office or otherwise in relation thereto, including any liability incurred by him in defending any proceedings, whether civil or criminal, in which judgment is given in his favour or in which he is acquitted or in connection with any application under Section 144 or Section 727 of the [United Kingdom Companies] Act [1985] in which relief is granted to him by the Court, and no Director or other officer shall be liable for any loss, damage or misfortune which may happen to or be incurred by the Com-

pany in the execution of the duties of his office or in relation thereto. But this Article shall only have effect in so far as its provisions are not avoided by Section 310 of the Act.

(Third–Party Compl. Ex. B.) Anglo contends that Article 13(a) permits indemnification only against liability owed to the corporation, not to third parties, and that section 310 of the English Companies Act of 1985 likewise permits indemnification only of liability owed to the corporation.

Both Fitzpatrick and Anglo apply the law of the United Kingdom to this dispute. "[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984); *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 137 (2d Cir.1991). New York's choice of law rules, which apply here because the court is sitting in diversity, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), mandate the use of the "grouping of contacts" test. *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 226, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). Anglo is a British company, its Articles were adopted in the United Kingdom, (3d Party Compl. Ex. B), and its sole place of business is in London. (Mitchell Aff. ¶ 3.) There is no evidence before the court warranting the application of the law of another jurisdiction. Therefore, the court will apply the law of the United Kingdom to this dispute.

Pursuant to Rule 44.1, F.R.Civ.P., once an issue of foreign law has been properly raised, a federal court may make a determination of that law as a matter of law, and in making that determination "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Rule 44.1, F.R.Civ.P. "[F]oreign law should be argued and briefed like the domestic law," *Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275, 1285 (S.D.N.Y.1980) (Pollack, J.) (quoting Pollack, *Proof of Foreign Law,* XXVI Am.J.Comp.L. 470, 475 (1978)), *aff'd,* 633 F.2d 203 (2d Cir.1980), and as with

domestic law judges should use both their own research and the evidence submitted by the parties to determine foreign law. *Ackermann v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986).

■ Where the issue of foreign law has not been addressed by the courts of the foreign jurisdiction, then a federal court must engage in the two-step process of determining what the courts of the forum state would predict that the courts of the foreign jurisdiction would find. *Rogers v. Grimaldi*, 875 F.2d 994, 1002 n. 10 (2d Cir.1989). Although the procedure by which New York courts predict the content of unsettled foreign law is itself somewhat ambiguous, the Second Circuit has indicated that it

> believe[s] that New York courts would, as a matter of substantive interpretation, presume that the unsettled common law of another state would resemble New York's but that they would examine the law of the other jurisdiction and that of other states, as well as their own, in making an ultimate determination as to the likely future content of the other jurisdiction's laws.

*Id.* at 1003.[4] That is the process that this court will follow.

Section 310 of the Companies Act, ch. 6 (1985), which is set out in relevant part in the margin,[5] bars companies from indemnifying their officers and directors against or exempting the officers and directors from liability which they would otherwise incur "in respect of any negligence, default, breach of duty or breach of trust of which [they] may be guilty in relation to the company," except under three circumstances. It is undisputed that none of the three exceptions applies here, so the issue is whether the general rule bars all indemnification or whether the phrase "in relation to the company" means that the general rule bars only indemnification of liability owed to the company. Anglo advocates the former interpretation, while Fitzpatrick advocates the latter.

■ The first source for interpretation of a statute is the words of the statute itself. 44 *Halsbury's Laws of England* ¶ 857 (Lord Hailsham of St. Marylebone ed., 4th ed. 1983); *see also North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). Anglo argues that there are three aspects of subsection (3) which show that it was intended to address indemnification against claims by third parties. First, subsection (3)(b)(i) allows indemnification against liability incurred in criminal proceedings, which are brought not by the company but by the government, which Anglo insists is a third party. The court does not find this argument persuasive, however. Section 310 specifies that its scope is limited to those acts which the officer or director undertakes "in relation to the company." If that phrase is interpreted, as Fitzpatrick urges, to mean only those acts through which the officer or director has harmed the company, then it does not matter whether the lawsuit seeking punishment or a remedy for those acts is brought by the company or by the government. Therefore, the inclusion of criminal prosecutions in subsection (3)(b)(i) does not shed light on whether section 310

---

**4.** Anglo argues that New York courts presume that foreign law resembles New York law only when foreign law has not been adequately proven, not when the foreign law is unsettled. As the Second Circuit has made clear, however, that is simply not the case. *Id.*

**5.** The text of section 310 is as follows:

(1) This section applies to any provision, whether contained in a company's articles or in any contract with the company or otherwise, for exempting any officer of the company ... from, or indemnifying him against, any liability which by virtue of any rule of law would otherwise attach to him in respect of any negligence, default, breach of duty or breach of trust of which he may be guilty in relation to the company.

(2) Except as provided by the following subsection, any such provision is void.

(3) This section does not prevent a company—
(a) from purchasing and maintaining for any such officer ... insurance against any such liability, or
(b) from indemnifying any such officer ... against any liability incurred by him—
(i) in defending any proceedings (whether civil or criminal) in which judgment is given in his favour or he is acquitted, or
(ii) in connection with any application under section 144(3) or (4) (acquisition of shares by innocent nominee) or section 727 (general power to grant relief in case of honest and reasonable conduct) in which relief is granted to him by the court.

prohibits indemnification in all actions or only in those brought by the company or by the government in response to harm to the company.

■ Second, the "English rule" on costs would require the company to pay the legal fees of any victorious defendant officer or director. Anglo asserts that whenever proceedings were brought against the officer or director by the company the "English rule" would apply and the court would order the company to pay the costs, making the subsection 3(b)(i) exception necessary only in cases brought by third parties. This argument is puzzling in light of the fact that the "English rule" applies to all actions and does not distinguish in any way actions by a company against its officers and directors. Supreme Court Act, 1981, ch. 54 § 51 (Eng.). In fact, although costs are generally awarded to successful litigants, 37 *Halsbury's Laws of England* ¶ 717 (Lord Hailsham of St. Marylebone ed., 4th ed. 1982), the full amount of costs is rarely awarded. R.J. Walker & M.G. Walker, *The English Legal System* 298 (1972). Furthermore, there are numerous exceptions to the general rule that costs are awarded, and the court always has discretion to deny costs. *See* Supreme Court Act, 1981, ch. 54 § 51 (Eng.) Thus, in cases brought by companies and third parties alike, successful defendants may have to cover some costs themselves for which they will desire indemnification.

Third, Anglo argues that the exception allowing companies to take out directors' and officers' ("D & O") insurance policies indicates that litigation by third parties was contemplated because such policies "are principally addressed to claims made against the directors and officers by third parties and not the company which takes out the policy." (Taylor Reply Aff. ¶ 18.) The principal use of D & O insurance is not at issue here, however. What matters is whether the D & O insurance exception makes sense if the statute is interpreted as prohibiting only indemnification of liability owed to the company. In fact, during the mid–1980's, prior to the enacting of the D & O insurance exception, an increasingly popular use for D & O insurance in England was to cover "the risk of a claim by a disgruntled shareholder." *See, e.g.,* Derrick Owles, *Insurance Against Directors' Liability,* New L.J., Aug. 29, 1986, at 820. Thus, the fact that section 310 contains an exception permitting companies to purchase D & O insurance does not indicate that section 310 was intended to bar indemnity against claims by third parties.

■ The words of the statute do not indicate whether the interpretation of Fitzpatrick or that of Anglo is correct, so the court will examine the circumstances surrounding the enacting of section 310. Under the common law, directors, as employees of their companies, were entitled to be indemnified for liability incurred in following the "lawful orders" of the company. *In re Famatina Dev. Corp.,* 2 Ch. 271, 280 (00431 of 1912) (1914) (Eng.). In the early decades of this century, public outrage was excited by a series of cases in which articles of incorporation[6] exempting directors from liability to the corporation were upheld. In one such case, directors could incur liability only in cases of dishonesty, *In re Brazilian Rubber Plantations & Estates Ltd.,* 1 Ch. 425 (1911) (Eng.), while in another directors could incur liability only in cases of "wilful neglect or default." *In re City Equitable Fire Ins. Co.,* 1 Ch. 407 (0048 of 1922) (1924) (Eng.). In response, the Greene Committee on Company Laws ("the Greene Committee") was appointed to consider the question of liability. The Greene Committee found that such provisions in articles of incorporation gave "a quite unjustifiable protection to directors," and it recommended the invalidation of all contracts or articles of incorporation excusing directors and officers from or indemnifying them against liability incurred for negligence, breach of duty or breach of trust. Company Law Amendment Committee, Report at 19–20 (1926) (Eng.)

The Greene Committee did not specifically address whether it intended to require liability only in cases brought by the company or

---

**6.** This opinion will use the American term "articles of incorporation" instead of the English term "articles of association."

whether it intended to require liability in cases brought by third parties as well. In both cases cited by the Greene Committee, however, the director had injured the corporation, not a third party. It is clear from the Committee's report that it considered the issue only in that context, because the Committee noted that "[i]t is only when [a director] has been negligent *and the company have suffered a loss,* that he is content to take shelter behind the article [exempting him from liability]." *Id.* (emphasis added).

Section 78 of the Companies Act 1928 transformed the Greene Committee's recommendation into law, and the relevant provisions were re-enacted with few substantive changes as section 152 of the Companies Act 1929, section 205 of the Companies Act 1948, section 310 of the Companies Act 1985, and section 137 of the Companies Act 1989. The only amendment pertinent to the question at hand was that made in 1989, when subsection (3) was added. This subsection permits companies to insure their officers and directors against liability and to indemnify them in three specific circumstances.

In support of its interpretation of section 310, Anglo points to a statement made by Lord Hacking during a committee debate in Parliament prior to passage of the 1989 amendment. Preliminarily, the court notes that this debate concerned a version of the amendment that was eventually withdrawn, so it cannot be considered part of the direct history of the current version of section 310. However, the policies being debated were among those embodied in the final version of the 1989 amendment, so the court will try to glean Parliament's intention from the debate. In the course of the debate, Lord Hacking noted the escalating need for D & O insurance in light of "the increase in the number of statutory provisions which impose personal liability on directors and in the amount of litigation, particularly for companies involved in the United States." House of Lords, April 11, 1989 at 199 (Hansard) (Eng.). Anglo argues that "the question of whether or not a UK company did business in the United States could only affect the exposure of directors to third party claims and not to claims by the company itself." (Taylor Reply

Aff. ¶ 15.) From this, Anglo concludes that Lord Hacking seems to have been concerned about third-party lawsuits by Americans and that he assumed that section 310 covered liability owed to both third parties and companies.

However, in the same speech Lord Hacking also mentions a consultative document that the Department of Trade and Industry ("DTI") issued in February, 1988, in which the DTI clearly stated that the law did not apply to indemnification from liability incurred in lawsuits brought by third parties. House of Lords, April 11, 1989 at 199 (Hansard) (Eng.); *see also Indemnifying Directors' Liability,* 85 L. Society's Gazette, July 13, 1988, at 14 (DTI proposed amending section 310 to bar indemnification of directors from liabilities owed to third parties). Since Lord Hacking was aware of the DTI's opinion that section 310 did not cover liabilities owed to third parties, and since he did not pursue DTI's recommendation that the law be amended to bar indemnification in such cases, it seems fair to assume that he was concerned about liability owed to the company and not to third parties.

Further evidence that the debate concerned indemnification of liability owed to the company is found in a statement by Lord Strathclyde, a DTI minister present at the committee meeting, that safeguards would be necessary if companies were permitted to buy insurance for their officers and directors because "it would ultimately be the shareholders' money that would be used to insure the directors against claims which might be made against them for failure *in a duty to the shareholders.*" House of Lords, April 11, 1989 at 201 (Hansard) (Eng.).

The impression that the amendment was passed in an environment of concern regarding indemnification of liability owed to the company is borne out by the final version of the 1989 amendment as embodied in subsection (3) of section 310. Subsection (3) expressly permits indemnification in connection with applications for indemnification under two statutes, both of which involve liability to the company, not to third parties. Section 144 of the Companies Act 1985 holds directors liable to the company for paying up

or paying premiums on shares in certain companies where a nominee of the company fails to pay, although it allows companies to relieve directors who have acted honestly and reasonably of such liability. Section 727 of the Companies Act 1985 allows courts to relieve directors from liability to their corporations in certain situations.

It is clear that both the 1928 Companies Act and the 1989 amendment were passed in an environment of concern regarding the extent to which companies should be allowed to indemnify officers and directors against liability to the company. Aside from Lord Hacking's ambiguous comment, there is simply no evidence that Parliament wished to address the extent to which companies could indemnify directors and officers against liability to third parties. This may be because lawsuits by third parties against officers and directors have increased only recently in England, *see* John C. Vann, *Directors Should Step Warily,* 139 New L.J. 1428 (1989), so there simply has not been an occasion for Parliament to consider whether companies should provide indemnification in such situations. The court notes that different policy considerations pertain to prohibiting indemnification of different types of liability. In particular, the incongruity of shareholders who have been wronged by a director indemnifying that director, which has been given as a reason to refuse to permit companies to indemnify or insure officers and directors against liability owed to the company, *see* House of Lords, April 11, 1989, at 201 (Hansard) (Eng.), would not occur where the shareholders are indemnifying directors against liability to third parties.

"Except insofar as they are clearly and unambiguously intended to do so, statutes should not be construed so as to make any alteration in the common law or to change any established principle of law." 44 *Halsbury's Laws of England* ¶ 904; *see also United States v. Texas,* — U.S. —, —, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993) (" '[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident' ") (quot-

ing *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)). Under the law as it existed prior to the Companies Act 1928, there were no limits on the liabilities against which companies were permitted to indemnify directors and officers. *In re City Equitable Fire Ins. Co.,* 1 Ch. 407, 409–10 (0048 of 1922) (1925) (Eng.). Parliament has clearly expressed its intent to limit indemnification of liability owed to the company, but since it has not clearly and unambiguously expressed an intent to limit indemnification of liability owed to third parties, the court finds that such a limitation was never made.

This construction of section 310 is supported by reference to New York law, which this court will assume that English law resembles. *See* discussion *supra* pp. 1076–1077. In New York, corporations may indemnify directors and officers for expenses incurred as the result of a lawsuit by a third party by reason of their service as officers or directors where the officer or director "acted, in good faith, for a purpose which he reasonably believed to be in ... the best interests of the corporation and, in criminal actions or proceedings, in addition, had no reasonable cause to believe that his conduct was unlawful." N.Y.Bus.Corp. Law § 722 (McKinney Supp.1995).

Finally, both parties present the court with conflicting interpretations issued by legal experts and contained in treatises. The legal experts retained by the parties, whose qualifications appear to be commensurate, reach exactly opposite conclusions regarding the applicability of section 310 to indemnification of liability owed to third parties. *Gower's Principles of Modern Company Law* takes Anglo's approach, although it acknowledges that there is disagreement with that view, (Taylor Aff. Ex. D at p. 574), while the Law Society's Standing Committee on Company Law and the DTI, the government ministry with primary responsibility for interpreting and enforcing the Company Law 1985, side with Fitzpatrick. *Indemnifying Directors' Liability,* 85 L. Society's Gazette, July 13, 1988, at 14. Although expert testimony is certainly relevant to the court's interpretation of the statute, it is not binding on the

court. *Chantier Naval Voisin v. M/Y Daybreak,* 677 F.Supp. 1563, 1567 (S.D.Fla.1988). Given the sharply conflicting constructions emanating from such eminent sources, the court is justified in reaching an independent conclusion regarding the construction of the statute.

Having determined that corporate indemnification of directors and officers against liability to third parties is permissible under English law, the question remains whether such indemnification is authorized in article 13(a) of Anglo's articles of incorporation. Anglo argues that the article tracks the language of section 310 of the Companies Act, that section 310 prohibits indemnification where the liability is owed to third parties, and that therefore article 13(a) likewise does not permit indemnification of liability owed to third parties. Since the court has found that section 310 does not prohibit indemnification where the liability is owed to third parties, it rejects this argument. Article 13(a) itself does not contain any indication that it is intended to permit indemnification of liability owed to the company only. On the contrary, the article authorizes indemnification "against *all* losses or liabilities which [a director or officer] may sustain or incur in or about the execution of the duties of his office or otherwise in relation thereto" (emphasis added).

Pointing to the phrase "in which judgment is given in his favour," Anglo contends that a director who has been found liable for negligence is not entitled to reimbursement. This is a reasonable interpretation of the language of the article, but it is not the only reasonable interpretation. The article first states that a director or officer should be indemnified "against all losses or liabilities which he may sustain or incur," and it is possible that the phrase "including any liability incurred by him in defending any proceedings ... in which judgment is given in his favour or in which he is acquitted or in connection with any application under Section 144 or Section 727 of the [Companies] Act [of 1985] in which relief is granted to him by the Court" is merely intended to provide an example of the types of indemnification permitted and to indicate, by tracking the language of section 310, that the company intends to provide indemnification to the fullest extent allowed by the law.

The court is justified in granting Anglo's motion to dismiss only if Fitzpatrick can prove no set of facts in support of his third-party complaint that would warrant judgment for him. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Fitzpatrick alleges in his complaint that under article 13(a) he "is entitled to be indemnified by Anglo against all losses or liabilities which he may sustain or incur by virtue of plaintiffs' claims against him as alleged in the Amended Complaint." (3d Party Compl. ¶ 8.) Since article 13(a) is ambiguous and is susceptible to the interpretation that Fitzpatrick ascribes to it, the motion to dismiss must be denied. *See New York State Energy Research & Dev. Auth. v. Nuclear Fuel Servs., Inc.,* 666 F.2d 787, 789 (2d Cir.1981) (interpretation of contract raises a question of fact, and where plaintiff's interpretation is not unreasonable, summary judgment must be denied).

### IV.

The third-party defendant's motion to dismiss the third-party complaint is denied.

**IT IS SO ORDERED.**