**TORAH SOFT LTD., Plaintiff,**

v.

**Michael DROSNIN, Defendant.**

**No. 00 CIV. 0676(JCF).**

United States District Court,
S.D. New York.

Sept. 16, 2002.

Howard I. Rhine, Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, LLP, New York City, for plaintiff.

Marcia B. Paul, William H. Crosby, Jr., Kay & Boose, LLP, New York City, Kenneth D. Burrows, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

FRANCIS, United States Magistrate Judge.

The defendant in this action, Michael Drosnin, is the author of the bestselling book *The Bible Code*, in which he purports to have discovered prophesies of future events embedded within the text of the Hebrew Bible. The plaintiff, Torah Soft Ltd. ("Torah Soft"), is a corporate entity whose principal shareholder and sole officer, Dr. Yochanon Spielberg, created computer software that Mr. Drosnin used in connection with the creation of his book. The plaintiff contends that Mr. Drosnin breached agreements to provide publicity for Torah Soft and to give the plaintiff the opportunity to market its software with the book. Mr. Drosnin has filed counterclaims against Torah Soft and third-party claims against Dr. Spielberg asserting that they committed breach of contract by offering for sale to the public the software that had been modified for his exclusive use. Mr. Drosnin further alleges that Torah Soft and Dr. Spielberg engaged in unfair competition by falsely representing that he had used Torah Soft's computer program to write his book.

The parties consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c). Mr. Drosnin has now moved under Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint. Torah Soft and Dr. Spielberg have cross-moved for summary judgment on the counterclaims and third-party claims and have also moved for sanctions pursuant to 28 U.S.C. § 1927 on the ground that Mr. Drosnin's counsel acted in bad faith by failing to withdraw three of the counterclaims and third-party claims until confronted with Torah Soft's summary judgment motion.

For the reasons that follow, Mr. Drosnin's summary judgment motion is granted in part and denied in part, and Torah Soft's motions for summary judgment and for sanctions are denied.

*Background*

According to Bible code theory, the Hebrew Bible contains predictions of the future encrypted in its text. The first step in breaking the code is to identify letters, each equidistant from the next (equidistant letter skips or "ELS's"), that form a word or phrase. For example, in *The Bible Code*, Mr. Drosnin contends that the name "Yitzhak Rabin" appears once in the Bible, with each letter separated by 4,772 others. The relevant ELS is therefore 4,722. Next, the text of the Bible is rearranged into columns of letters, each the length of the chosen ELS. In the example, columns of letters 4,772 units high form a matrix. That matrix can then be examined to determine whether any recognizable phrase crosses the word at issue, implying a prophesy. In this instance, the name "Yitzhak Rabin" is intersected by the words "assassin will assassinate," a "prediction" that proved accurate.

According to Dr. Spielberg, he first developed a computer program for conducting Bible code searches (the "Software") in 1988. (Declaration of Yochanan Spielberg dated March 25, 2002 ("Spielberg 3/25/02 Decl."), ¶ 4). On August 17, 1992, he was contacted by Mr. Drosnin who had purchased a copy of the Software and was interested in using it in connection with a book he intended to write about the Bible code. (Spielberg 3/25/02 Decl., ¶¶ 8–10). In order for the Software to be most useful to Mr. Drosnin, certain modifications were required, and Dr. Spielberg alleges that he agreed to perform the necessary programming services in return for compensation at the rate of $20 per hour and the promise of publicity in connection with

the book. (Spielberg 3/25/02 Decl., ¶¶ 10, 12, 14). Dr. Spielberg contends that $20 per hour was far below the market value for his services and that he agreed to it only because of the accompanying promise of publicity. (Spielberg 3/25/02 Decl., ¶¶ 14, 15, 51). On the same day that this conversation took place, Mr. Drosnin sent Dr. Spielberg a facsimile outlining the requested modifications to the Software and stating, "I think that the work I'm doing will eventually lead to a lot of publicity for your company, and I'll appreciate any assistance you can give me." (Affirmation of Howard I. Rhine dated March 26, 2002 ("Rhine 3/26/02 Aff."), Exh. 1).

Dr. Spielberg claims that in September 1992 he spoke with Mr. Drosnin about the nature of the publicity that Torah Soft would receive. When he asked whether Torah Soft would be mentioned by name in the book, Mr. Drosnin replied that it would. (Spielberg 3/25/02 Decl., ¶ 17). Dr. Spielberg also asked if the book would include Torah Soft's fax number and e-mail address, and Mr. Drosnin answered, "Yes." (Spielberg 3/25/02 Decl., ¶ 18). According to Dr. Spielberg, on at least fifteen occasions when Mr. Drosnin requested additional programming services, he reiterated that Torah Soft would receive substantial publicity and "make a lot of sales" as a result of publication of the book. (Spielberg 3/25/02 Decl., ¶ 20).

Similarly, in March 1995, Mr. Drosnin requested modifications to the Software that required the use of a utility program known as a "debugger." When Dr. Spielberg told him that the debugger would cost a few hundred dollars, Mr. Drosnin purportedly said, "You're going to make a lot of software sales when my book comes out, so I do not want to pay 100% of the cost of the debugger. Let's split it." Dr. Spielberg then purchased the debugger on that basis. (Spielberg 3/25/02 Decl., ¶¶ 29, 30, 31).

According to Dr. Spielberg, Mr. Drosnin not only promised him publicity, but also raised the possibility of marketing the Software together with the book. In September 1994, Mr. Drosnin suggested several possibilities: a disk with the Software could be included with each copy of the book, the book and the Software could be marketed simultaneously by the same publisher, or marketing could be coordinated between the book's publishers and a software distributer. In addition, if the Software were not sold jointly with the book, an advertising insert could be included in the book. (Spielberg 3/25/02 Decl. ¶¶ 59, 60). In December 1995, Mr. Drosnin promised Dr. Spielberg that if he were to market any software with the book, it would be Torah Soft's product. (Spielberg 3/25/02 Decl., ¶¶ 63, 64, 65).

*The Bible Code* was ultimately published in 1997. It included no reference to Torah Soft or Dr. Spielberg, but credited Dr. Eliyahu Rips, an Israeli mathematician, with "discovery" of the Bible code. (Affidavit of William H. Crosby, Jr. dated March 25, 2002 ("Crosby 3/25/02 Aff."), Exh. F, at 13–14). No software was marketed with the book.

In addition to contesting many of the plaintiff's allegations, Mr. Drosnin asserts that when he engaged Dr. Spielberg to modify the Software, they agreed that the enhanced version would be for Mr. Drosnin's exclusive use and would not be sold or distributed to others. (Affidavit of Michael Drosnin dated March 22, 2002 ("Drosnin 3/22/02 Aff."), ¶ 4). According to Mr. Drosnin, Dr. Spielberg acknowledged this agreement by including in the opening screen of the Software the legend: "For use of Michael Drosnin Only!" (Drosnin 3/22/02 Aff., ¶ 4). However, subsequent to publication of *The Bible Code,* Dr. Spielberg sold copies of the modified Software to the public.

In connection with those sales, Torah Soft placed an advertisement on its website in 1998 that included the catchphrase: "Now use the same program that Michael Drosnin used to write *The Bible Code.*" (Drosnin 3/22/02 Aff., ¶ 5). Mr. Drosnin contends, however, that he relied on Dr. Rips' computer program to write the book and only used Torah Soft's Software to do preliminary research and to print out the matricies that were used in the book to illustrate the Bible code "finds." (Drosnin 3/22/02 Aff., ¶ 5).

Torah Soft first filed a complaint against Mr. Drosnin and his publisher, Simon and Schuster, Inc., in 1998 in New York State Supreme Court. (Affidavit of William H. Crosby, Jr. dated Jan. 31, 2002 ("Crosby 1/31/02 Aff."), attached to Notice of Motion, Exh. A). The claims against Simon and Schuster were dismissed by stipulation (Crosby 1/31/02 Aff., Exh. B), and Torah Soft subsequently filed its First Amended Complaint. (Crosby 1/31/02 Aff., Exh. C). That pleading alleged four claims against Mr. Drosnin: breach of contract, breach of fiduciary duty, quantum meruit, and unjust enrichment. (Crosby 1/31/02 Aff., Exh. C).

In the meantime, Mr. Drosnin had filed an answer with cross-claims against Torah Soft and parallel third-party claims against Dr. Spielberg. The First Counterclaim[1] charges that Torah Soft breached an agreement with Mr. Drosnin to maintain the modified Software for his exclusive use by marketing that Software to the public. (Affirmation of Howard I. Rhine dated Jan. 31, 2002 ("Rhine 1/31/02 Aff."), attached to Notice of Motion for Summary Judgement, Exh. 1 ("Answer"), ¶¶ 83–100). The Second and Third Counterclaims allege false advertising and deceptive trade practices, respectively, in violation of New York General Business Law, on the ground that Dr. Spielberg sold the Software with the false representation that it had been used by Mr. Drosnin to write *The Bible Code.* (Answer, ¶¶ 101–106). The Fourth Counterclaim asserts that by using Mr. Drosnin's name to market the Software without his permission, Dr. Spielberg and Torah Soft violated New York Civil Rights Law § 51. (Answer, ¶¶ 107–110). Finally, the Fifth Counterclaim raises a common law claim of unfair competition, again based on the representation that the Software was used to write the book. (Answer ¶¶ 111–114).

Mr. Drosnin then moved to dismiss the First Amended Complaint. In a decision dated June 17, 1999, the Honorable Ira Gammerman first found that the dispute is governed by Israeli law insofar as it is a claim for breach of a contract for personal services. (Crosby 1/31/02 Aff., Exh. E at 4–6). Justice Gammerman rejected the argument that the entire Complaint should be dismissed for failure to join Dr. Spielberg as a necessary party. (Crosby 1/31/02 Aff., Exh. E at 6–10). He then went on to dismiss the breach of fiduciary duty claim, finding that Dr. Spielberg had failed to properly allege a partnership between himself and Mr. Drosnin that would give rise to such a duty. (Crosby 1/31/02 Aff., Exh. E at 11–13). Finally, Justice Gammerman denied the motion to dismiss the quantum meruit and unjust enrichment claims, in part because Mr. Drosnin, the moving party, failed to provide any affidavit setting fourth the relevant Israeli law. (Crosby 1/31/02 Aff., Exh. E at 14–16). Justice Gammerman's decision was affirmed by the Appellate Division, First Department on January 25, 2000. *Torah Soft Ltd. v. Drosnin*, 268 A.D.2d 367, 702 N.Y.S.2d 272 (1st Dep't 2000).

Thereafter, Mr. Drosnin removed the case to this Court pursuant to 28 U.S.C.

---

1. For convenience, I will identify each counterclaim and the corresponding third-party claim simply by reference to the counterclaim.

§ 1441, on the ground that the plaintiff's claim was essentially one for copyright infringement over which the federal court would have exclusive jurisdiction.[2] After the completion of discovery, the parties filed the instant motions.

The defendant argues that Torah Soft's breach of contract claims with respect to the provision of publicity are deficient under Israeli law in three respects. First, the general promise to provide publicity for Torah Soft was too vague and indefinite to be enforceable. Second, any promise was made in the context of pre-contractual negotiations or social discourse, and was not binding. And, third, there was no evidence of the parties' resolve to be bound by such a promise. Similarly, Mr. Drosnin argues that there was no binding contract that obligated him to market Torah Soft's Software with *The Bible Code.* Again, he contends that the alleged agreement was too indefinite to be enforced and that the parties did not display a resolve to be bound. He also maintains that any agreement was voided because it was based on a condition precedent—that some software be sold with the book—which did not occur. Finally, the defendant argues that the claims of unjust enrichment and quantum meruit must be dismissed because the only enforceable contract that existed—that which required him to pay Dr. Spielberg $20 per hour for modifying the Software—was fully performed.

Dr. Spielberg and Torah Soft cross-moved for summary judgment on each of the counterclaims and third-party claims. They contend that the First Counterclaim, for breach of contract, is preempted by United States copyright law. Dr. Spiel-berg and Torah Soft argue that the defendant's common law unfair competition claim should be dismissed because of the failure to allege bad faith and a likelihood of confusion to consumers. They also moved for judgment on the defendants' Second, Third, and Fourth Counterclaims, but Mr. Drosnin withdrew them.

Finally, Dr. Spielberg and Torah Soft have moved for sanctions pursuant to 28 U.S.C. § 1927 on the ground that the defendant's failure to withdraw the three moribund counterclaims at some earlier date constituted bad faith and was designed to multiply the proceedings. I will address each motion in turn.

## Discussion

### A. Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co.,* 189 F.3d 208, 214 (2d Cir.1999). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

2. Dr. Spielberg subsequently filed a copyright action against Mr. Drosnin and Simon and Schuster, but the Honorable Shira A. Scheindlin, U.S.D.J., granted summary judgment to the defendants, finding that none of the features of the database at issue were sufficiently original to qualify for copyright protection. *Torah Soft Ltd. v. Drosnin,* 136 F.Supp.2d 276 (S.D.N.Y.2001).

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. 2505; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). Nonetheless, the "litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (internal quotations omitted); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). Rule 56 requires that when a summary judgment motion is made and supported, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### B. *Defendant's Summary Judgment Motion*

### 1. *Contract Claim—Publicity*

### a. *Governing Law*

■ Justice Gammerman previously determined that the contractual arrangements between Mr. Drosnin and Torah Soft concerning the services provided by Dr. Spielberg are governed by Israeli law. There is no occasion to revisit that decision. The law of the case doctrine generally applies to decisions made by a state court prior to removal to federal district court. *See Rekhi v. Wildwood Industries, Inc.,* 61 F.3d 1313, 1317–18 (7th Cir.1995); *Bogosian v. Board of Education of Community School District 200,* 73 F.Supp.2d 949, 954 (N.D.Ill.1999); 18 *Moore's Federal Practice* § 134.22[3][c][i] (3d ed. 1999) ("When an action is removed from a state court to a federal court, the law of the case doctrine applies to the decisions entered by the state court prior to removal."). Pursuant to that doctrine, a court may review a matter previously decided in any of three circumstances: (1) where there has been an intervening change of controlling law, (2) where new evidence has become available, or (3) where there is a need to correct a clear error or prevent manifest injustice. *See United States v. Minicone,* 26 F.3d 297, 300 (2d Cir.1994). No such factor is present in this action. In addition, in a removed case a federal court may reconsider a determination based on state procedural law if its application in the federal forum would be anomalous. *See Soda v. Oldsmobile Division of General Motors Corp.,* No. CIV–88–1155E, 1990 WL 130524, at *2 (W.D.N.Y. Aug.30, 1990). Again, that is not the case here. Accordingly, this issue will be determined pursuant to Israeli law.

Each party has submitted expert affidavits with respect to the Israeli law of contracts. The respective experts are both highly qualified. The defendant's expert, Joel Singer, received his law degree from Tel Aviv University Law School and served as Legal Advisor to the Israeli Ministry of Foreign Affairs. He is currently a partner at Sidley Austin Brown &

Wood LLP. (Affidavit of Joel Singer dated Jan. 30, 2002 ("Singer Aff."), ¶ 2). The plaintiff's expert, Opher Levenberg, received his Bachelor of Law degree from the Hebrew University of Jerusalem and is a partner in the firm of Haim Samet, Steinmetz, Harig & Co. in Tel Aviv. (Declaration of Opher Levenberg dated March 24, 2002 ("Levenberg Aff."), ¶¶ 1, 3).

These experts are in substantial agreement with respect to the broad contours of Israeli contract law. In general, oral contracts are fully enforceable. Contracts (General Part) Law, 5733–1973, § 23.[3] As a threshold matter, the parties must intend to enter into a binding legal relationship, as opposed to a mere societal agreement like a promise to come to dinner. (Singer Aff., ¶¶ 2, 4).[4]

> Without an intention to create a contract, there is neither room nor reason to deal with the provisions of the contracts laws, because this phenomenon is not a contract and the [Israeli] Contracts Law does not apply to it. Accordingly, the intention to create legal-contractual relations is, in my view, a preliminary requirement to entry into the contracts domain. The [Israeli] Contracts Law, which opens with the word "contract," through the requirement for an intention to create legal relations, serves as a filter that separates between contractual and non-contractual phenomena. With regard to an agreement that is not characterized by an intention to create legal-contractual relationships, one should not proceed along the course created by the legislating authority by asking whether a "con-

tract" was formed through an offer and acceptance, as required by Article 1 of the Contracts Law. A societal agreement is not a contract to which the contracts laws are applicable, because it does not include an intention to create legal relationships.

Gabriela Shalev, *Contracts Laws* 84 (Jerusalem, 2d ed.1995). Furthermore, even in the context of a commercial relationship, statements may not be legally binding if the parties' words or conduct indicate that they did not intend a formal contract.

> Even when the parties are interested in a legal relationship, they may assign a different strength to their statements. Thus, for instance, mere boasting by the seller praising his merchandise does not express any commitment by the seller regarding the quality of the product; such statements do not, by themselves, constitute an intention to create a legal relationship even though the parties intend to be bound by a contract for the sale of the merchandise.

Daniel Friedmann and Nili Cohen, *Contracts* 377–78 (Tel Aviv, 1991).

Even if an agreement falls into the category of contracts as opposed to societal relationships, it will not be enforceable unless there is sufficient evidence of the parties' resolve to be bound. Instead of adopting the common law principle of consideration as the basis for formation of a contract, Israeli law relies on the doctrine of "resolve to enter into a contract." (Singer Aff., ¶ 12 (citing Contracts (General Part) Bill, 1970 Haza'ot Hok 126)).

---

**3.** The Israeli law cited in this decision is taken directly from the submissions of the respective experts. Although the experts disagree about interpretation of that law and its application to the facts of this case, neither has suggested that the other has misquoted or misrepresented the holdings of the primary source materials.

**4.** The numbering of the paragraphs in Mr. Singer's affidavit starts over at the beginning of the Discussion section on page 6. The reference above as well as all subsequent references relate to paragraphs in that section.

Thus, Israel's codified Contracts Law provides in pertinent part:

> A person's proposal to another person constitutes an offer if it attests to the offeror's resolve to enter into a contract with the offeree and is sufficiently definite to enable the contract to be concluded by acceptance of the offer. A proposal may be to the public.
>
> .    .    .    .    .
>
> Acceptance shall be by notice by the offeree delivered to the offeror and attesting to the offeree's resolve to enter into the contract with the offeror in accordance with the offer.

Contracts (General Part) Law, 5733–1973, §§ 2, 5. This resolve must be displayed externally, and a party's subjective intent alone is insufficient. *See* C.A. 692/86 *Boutkovsky v. Gat*, P.D. 44(1) 57, 62 (1989); *Ravinai v. Man Shaked Co.*, P.D. 33(2) 281, 287 (1979); Shalev, *Contracts Laws*, at 86. The objective manifestation of the necessary resolve may include actions taken and statements made before, during, and after the conclusion of the contract. *See* C.A. 480/90 *Agadi v. Ben Chelouche* P.D. 45(3) 854, 860; Shalev, *Contracts Laws*, at 87.

Related to the issue of resolve to enter into a contract is the question of whether a promise is sufficiently definite to be enforceable.

> Generally, there is a non-contradictory connection between the [definiteness and resolve] elements of the offer: a vague expression of the proposal attests to a lack of resolve and is equivalent to a lack of definiteness; whereas a precise drafting of the terms of the proposal not only fulfills the requirement of definiteness, but also attests to the resolve of the offeror. The natural inclination of the [Israeli] court, guided by the objective of fulfilling the intention of the parties, is to describe a vague proposal as attesting to a lack of resolve.

Shalev, *Contracts Laws*, at 104; *see also* C.A. 1049/94 *Dor Energy v. Hachmad*, P.D. 50(5) 820. Accordingly, a contract will be binding only if the essential details of the transaction have been agreed to. *See* C.A. 153/74 *Avraham v. Habza*, P.D. 29(1) 737, 741; Shalev, *Contracts Laws*, at 88–90. Nevertheless,

> [i]n [Israeli] law, the rule is that the absence of specificity will not be used as a basis for one side to a contract to be relieved of an obligation that he took upon himself, with resolve to contract, if it is possible to give [the] obligation an appropriate interpretation that enables fulfillment of the contract[.]

P.C.A. 4976/00 *Piano House v. Mor* (2001).

■    Finally, to the extent that there are issues of Israeli law that neither party has addressed and that my independent research has not illuminated, it is appropriate to refer to New York law. It is well-established that in the absence of proof of foreign law, the law of the forum governs.

> [W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law.... The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties.... When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum.

Restatement (Second) of Conflicts of Laws § 136, cmt. h (1971); *see Clarkson Co. v. Shaheen*, 660 F.2d 506, 512 n. 4 (2d Cir. 1981) (applying New York law where parties failed to claim applicability of Canadian law); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 860 (2d Cir.1981) (applying New York law where parties did not claim applicability of foreign law, even though New York choice of

law rules would dictate use of Vietnamese law); *In re Bennett Funding Group, Inc. Securities Litigation*, 270 B.R. 126, 129 n. 4 (S.D.N.Y.2001) (applying New York law despite suggestion that Bermuda law would apply where "none of the parties have proven foreign law through the submission of affidavits, statutory authority, case authority, sworn testimony or other similar evidence"). Similarly, when foreign law is unsettled, courts initially presume that the law on the question at issue would resemble that of the forum. *See Rogers v. Grimaldi*, 875 F.2d 994, 1002 n. 10 (2d Cir.1989); *Anglo American Insurance Group, P.L.C. v. CalFed, Inc.*, 899 F.Supp. 1070, 1077 (S.D.N.Y.1995); *Lenz v. Associated Inns and Restaurants Co.*, 833 F.Supp. 362, 378 n. 16 (S.D.N.Y.1993). Therefore, when experts provide reliable information on some but not all of the pertinent foreign law issues, the federal court may look to the law of the forum to fill the intersticies.

#### b. *Factual Disputes*

■ Applying this law to the facts viewed in the light most favorable to the plaintiff, it is apparent that summary judgment is inappropriate. First, a fact finder could conclude that Mr. Drosnin's promise to provide publicity for Torah Soft was not merely a social agreement akin to an promise to "do lunch." Certainly the commitment was made in the context of a business relationship: Mr. Drosnin had solicited Dr. Spielberg to make modifications to the Software so that it would be more useful in connection with writing *The Bible Code*. Moreover, while Mr. Drosnin's predictions that Torah Soft would receive "a lot of publicity" and "make a lot of sales" as a result of its association with the book could be characterized a mere puffing, his purported agreement to identify Torah Soft by name and provide its fax number and e-mail address in *The Bible Code* could qualify as a contractual commitment.

Second, there are sufficient indicia of Mr. Drosnin's resolve to contract. His references to publicity were not made in isolation. Rather, they were allegedly linked to Torah Soft's performance of contractual commitments to him: when Mr. Drosnin initially suggested in his facsimile seeking modifications to the Software that Torah Soft would receive beneficial publicity, when he urged Dr. Spielberg that they split the cost of a utility program, and when he periodically sought additional programming services from Dr. Spielberg. Even if the resolve to be bound to provide publicity were not evident in the first discussions and in the general language of the August 17, 1992 facsimile, it is demonstrated by Mr. Drosnin's alleged agreement a month later to incorporate in *The Bible Code* specific identifying information for Torah Soft. Such an objective manifestation is probative of the resolve to contract even where it is not contemporaneous with discussions of other aspects of the transaction. *Agadi*, P.D. 45(3) at 860; Shalev, *Contracts Laws*, at 87. And the fact that Mr. Drosnin did not yet have a contract to publish the book when he discussed publicity with Dr. Spielberg does not demonstrate a lack of resolve. It simply means that any commitment he made—such as a promise to provide publicity—was necessarily contingent on actual publication.

Finally, the alleged agreement to publicize Torah Soft was sufficiently definite to be contractually binding. To be sure, Mr. Drosnin's initial promise in August 1992 simply to provide some unspecified form of publicity for Torah Soft was too vague to be enforceable. But the defendant's agreement a month later to identify Torah Soft by name and to include contact information in the book supplied the necessary detail. Of course, even the September 1992 discussion did not address such minutiae as where in the book the credit would be displayed or how prominent it would be.

However, "the courts recognize that at some point, almost every agreement has a degree of indefiniteness." *Point Developers, Inc. v. Federal Deposit Insurance Corp.*, 921 F.Supp. 1014, 1022 (E.D.N.Y. 1996) (citation omitted). Accordingly, as long as the material terms have been agreed to, the remaining details of a contract may be left for future negotiation. *See id.* (agreement for loan at "prevailing rate plus 1 additional point" enforceable even though no agreement as to method for determining prevailing rate, payment schedule, or duration of loan); *Rates Technology, Inc. v. New York Telephone Co.*, No. 94 Civ. 9297, 1995 WL 438954, at *4 (S.D.N.Y. July 25, 1995) (agreement to enter into future patent license enforceable, though terms of that license undefined); *Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741, 762 (S.D.N.Y.1990) (agreement to perform for minimum consideration enforceable, with actual payment to be negotiated later). Mr. Drosnin thus could be found to have made an enforceable commitment at least as of September 1992. Summary judgment is therefore denied with respect to the publicity claim.

### 2. *Contract Claim—Joint Marketing*

■ According to Dr. Spielberg, Mr. Drosnin also promised Torah Soft a "right of first refusal" in the event that any software were jointly marketed with *The Bible Code.* The parties allegedly discussed different scenarios by which computer software sales could be linked to distribution of the book.

Under Israeli law, "[a] contract may depend on the fulfillment of a condition (hereinafter: suspensory condition) or may cease upon the fulfillment of a condition (hereinafter: resolutory condition)." Contracts (General Part) Law, 5733–1973 § 27(a). Consequently, "[w]hen a contract is subject to a condition and the condition is not fulfilled, then—in the case of a suspensory condition—the contract is voided...." *Id.* § 29.

The alleged agreement by Mr. Drosnin to give Torah Soft the first chance to market software jointly with the book was at most a conditional contract. Its enforceability depended upon the fulfillment of a suspensory condition: that arrangements be made in the first place to sell *some* software with *The Bible Code.* When that condition did not come to pass, Torah Soft lost any "right of first refusal."

Nevertheless, Torah Soft argues that Mr. Drosnin breached his duty to negotiate and to act in good faith when he failed to keep Dr. Spielberg apprised of any efforts to launch a joint marketing program. Under Israeli law, "[a] breach of the duty of good faith does not have to take the form of an active event, because omission through non-disclosure of facts, in circumstances that request their disclosure, is a blatant case of lack of good faith." C.A. 714/87, *Sher v. Cohen*, P.D. 43(3) 159, 163 (1989). Although the parties have presented no proof of how Israeli law would treat the duty of good faith in the context of fulfillment of suspensory conditions, New York law provides some guidance. "A party's failure to act in good faith so as to facilitate the occurrence of a condition precedent requires the condition to be deemed satisfied or excused, rendering the contract enforceable." *Cauff, Lippman & Co. v. Apogee Finance Group, Inc.*, 807 F.Supp. 1007, 1022 (S.D.N.Y.1992) (citation omitted) (New York law); *see also Dunnigan v. Metropolitan Life Insurance Co.*, 99 F.Supp.2d 307, 324 (S.D.N.Y.2000) (federal common law), *vacated on other grounds*, 277 F.3d 223 (2d Cir.2002); *Michael Kors Co. v. Compagnia Internazionale Abbigliamento S.p.A.*, No. 93 Civ. 8127, 1996 WL 509725, at *4–5 (S.D.N.Y. Sept.9, 1996) (New York law).

In this case, there is no evidence that Mr. Drosnin affirmatively hindered arrangements for jointly marketing software with the book. To the contrary, he apparently entered into preliminary negotiations in 1994 for the development of a computer program that could be used for this purpose. And, while Mr. Drosnin's good faith would certainly be in doubt if he cut Torah Soft out of such an arrangement, he specifically noted that any final agreement would be subject to Torah Soft's consent. (Affirmation of Howard I. Rhine dated March 26, 2002 ("Rhine 3/26/02 Aff."), Exh. 4). That these negotiations did not ultimately bear fruit, or that Dr. Spielberg was not notified of Mr. Drosnin's progress or lack of progress is not evidence of bad faith sufficient to excuse the non-satisfaction of the suspensory condition. In the absence of some arrangement to market software with *The Bible Code,* Torah Soft's alleged right of first refusal is unenforceable. Therefore, the defendant is entitled to summary judgment on this claim.

### 3. *Unjust Enrichment and Quantum Meruit*

According to the defendant's expert, "Israeli law includes a quasi contract doctrine which is similar to the U.S. doctrine of quantum meruit, and which, in effect, covers both of plaintiff's claims [of quantum meruit and unjust enrichment]." (Singer Aff., ¶ 34). The existence of a valid contract does not, by itself, preempt such claims. Rather, "[u]nder Israeli law, when a contract is breached, the plaintiff may sue the defendant for both a breach of contract as well as unjust enrichment of the defendant under the breached contract, provided that the plaintiff may collect only once (presumably, under the cause of action that entitles plaintiff to the higher amount)." (Singer Aff., ¶ 44 (citing D.N. 20/82 *Idres Construction Materials Ltd. v. Harlow & Jones GMBH,* P.D. 41(1) 221)).

As discussed above, the plaintiff's breach of contract claim with respect to the failure to provide publicity survives summary judgment. Therefore, so do the claims of quantum meruit and unjust enrichment.

### C. *Plaintiff's Summary Judgment Motion*

### 1. *Breach of Contract*

### a. *Preemption*

In his First Counterclaim, Mr. Drosnin asserts that Torah Soft and Dr. Spielberg breached their contractual obligations by selling the modified Software to the public despite a commitment to reserve the program for Mr. Drosnin's exclusive use. Torah Soft and Dr. Spielberg now move for summary judgment dismissing this counterclaim on the ground that it is preempted by federal copyright law, which provides that:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 ..., are governed exclusively by this title. [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). This argument fails for two reasons.

First, the copyright laws of the United States do not generally apply extraterritorially. *See Update Art, Inc. v. Modiin Publishing, Ltd.,* 843 F.2d 67, 73 (2d Cir.1988); *Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 634 (S.D.N.Y. 2000); *Shaw v. Rizzoli International Publications, Inc.,* No. 96 Civ. 4259, 1999 WL 160084, at \*3 (S.D.N.Y. March 23, 1999). That is certainly the case here, where the

agreement to modify the Software was entered into in Israel, the work was done in Israel, and there is no allegation that the Software has ever been sold in the United States. (*Cf.* Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1, ¶ 44 (indicating that the defendant does not allege that Torah Soft sells or advertises The Software in New York); Defendant's Statement of Material Issues of Fact Under Local Rule 56.1, ¶ 44 (admitting fact alleged in ¶ 44 of Plaintiff's 56.1 Statement)). Therefore, since federal copyright law does not apply, it cannot preempt Mr. Drosnin's claims.

■ Second, even if United States copyright law were applicable, it would not preempt the contract-based counterclaim. The general preemption provision of section 301(a) of The Copyright Act, cited above, is limited by section 301(b), which provides that:

> Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any state with respect to . . . activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106. . . .

17 U.S.C. § 301(b)(3). The exclusive rights identified in section 106 are the rights to (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work by sale or otherwise; and (4) perform, display, or transmit the work publicly. 17 U.S.C. § 106. Accordingly, determining whether a state claim is preempted requires a two-part analysis. First, the court must ascertain whether the subject matter requirement is met; that is, whether the work at issue is of the type that generally falls

within the protection of the Copyright Act. Second, the court must decide if the state law creates rights equivalent to those protected by federal copyright law. This is known as the general scope requirement. *See Lennon v. Seaman,* 63 F.Supp.2d 428, 435 (S.D.N.Y.1999); *Brignoli v. Balch Hardy and Scheinman, Inc.,* 645 F.Supp. 1201, 1204–05 (S.D.N.Y.1986).

■ Here, the subject matter requirement is met. Computer programs such as the modified Software are generally subject to the protections of the Copyright Act.[5] *See Computer Associates International, Inc. v. Altai, Inc.,* 982 F.2d 693, 702 (2d Cir.1992); *Architectronics, Inc. v. Control Systems, Inc.,* 935 F.Supp. 425, 438 (S.D.N.Y.1996). However, the general scope requirement is not satisfied. A state law establishes rights equivalent to federal copyright rights only if it does not require an "extra element." *Computer Associates,* 982 F.2d at 716. If the state law claim is predicated on an element "instead of or in addition to the acts of reproduction, performance, distribution, or display . . . then the right does not lie within the general scope of copyright, and there is no preemption." *Computer Associates,* 982 F.2d at 716 (citation and internal quotation marks omitted).

The breach of contract claim here includes such an extra element: an explicit promise with respect to future use of the Software. Based only on Torah Soft's marketing of the modified Software, Mr. Drosnin could assert a copyright claim, but he could not raise a breach of contract claim absent the additional allegation that Dr. Spielberg had agreed not to engage in such conduct.

---

**5.** Whether a general type of work is subject to copyright protection is distinct from the issue of whether a specific embodiment is in fact protectable. Thus, Judge Scheindlin's holding that the Software has no protectable elements, *Torah Soft,* 136 F.Supp.2d 276, would not by itself preclude a determination that state law claims are preempted.

Rights "equivalent to any of the exclusive rights within the general scope of copyright" are rights established by law—rights that restrict the options of persons who are strangers to the author. Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying. A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights."

*ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir.1996). Accordingly, "the 'extra element' that saves a contract claim from preemption is the promise itself." *Architectronics*, 935 F.Supp. at 439 (citation omitted); *see also Chesler/Perlmutter Productions, Inc. v. Fireworks Entertainment, Inc.*, 177 F.Supp.2d 1050, 1058–59 (C.D.Cal.2001) (terms of contract supply "extra element"); *Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1127 (N.D.Cal.2001) (same); *Asunto v. Shoup*, 132 F.Supp.2d 445, 452 (E.D.La.2000) ("the promise that is implicit in every contract, but is not necessary in an infringement action provides the extra element that precludes pre-emption"); *Lennon*, 63 F.Supp.2d at 437 ("the greater weight of the authority indicates that breach of contract actions are generally found not to be preempted by the Copyright Act"); *Brignoli*, 645 F.Supp. at 1205 (contractual term is "extra element"). Thus, the breach of contract claim in this case is qualitatively different from the assertion of rights under the Copyright Act and is therefore not preempted. *See Computer Associates*, 982 F.2d at 716.

b. *Enforceability*

■ Torah Soft and Dr. Spielberg argue that even if Mr. Drosnin's contractual claim is not preempted, it is unenforceable because it violates Israeli antitrust law and freedom of occupation. These contentions are meritless.

Section 4 of the Basic Law of Israel provides:

There shall be no violation of freedom of occupation except by a law befitting the values of the State of Israel, enacted for a proper purpose, and to an extent no greater than is required, or according to law as aforesaid enacted by virtue of express authorization in such law.

In effect, this law prohibits unreasonable non-compete clauses in employment agreements. Such provisions will be enforced only if limited in scope and duration, thus permitting the employee a reasonable opportunity to earn a livelihood. *See* L.A. 164/99, *Fromer v. Radguard Ltd. Takdin*, 99(2) 155 (1999); C.A. 6601/96, *AES Systems Inc.*, P.D. 54(3) 850 (2000). There is simply no evidence that this law would be extended to prohibit a contract by which an employee (or, as in this case, an independent contractor) agreed not to market independently a product that he had created as a work for hire. Since such an employee remains free to perform his occupation by selling any product other than that which was created for the exclusive use of the employer, the restriction is minimal and would not violate the Basic Law.

Similarly, the agreement alleged here would not violate Israeli antitrust law. Israel's Restrictive Business Practices Law generally forbids "restrictive arrangements," which are defined as follows:

A restrictive arrangement is an arrangement made between persons who manage businesses, according to which at least one of the parties imposes a restriction on himself which is liable to prevent or to reduce business competition between himself and a person who is not party to the arrangement.

Restrictive Business Practices Law 5748/1988, Ch. 2, § 2(a). Again, Torah

Soft and Dr. Spielberg proffer no persuasive evidence that this law would bar limitations on an employee disseminating a work for hire. Indeed, two explicit exceptions in the law suggest that that is not the case. Restrictions that limit the use of assets such as copyrights and developers' rights are not prohibited. Restrictive Business Practices Law, Ch. 2, § 3(2). Nor are exclusive supplier arrangements, including those by which a supplier agrees that it will "supply [the] asset or service for marketing only to the purchaser." Restrictive Practices Law, Ch. 2, § 3(6). Accordingly, the defenses mounted by Torah Soft and Dr. Spielberg under Israeli Law do not warrant granting summary judgment on Mr. Drosnin's First Counterclaim.

### 3. *Unfair Competition*

In his Fifth Counterclaim, Mr. Drosnin alleges that Torah Soft and Dr. Spielberg engaged in unfair competition by marketing the modified Software with the false representation that Mr. Drosnin had used it to write *The Bible Code.* In the Answer, this counterclaim is captioned "Unfair Competition—New York Common Law." (Answer, caption preceding ¶ 111). Accordingly, in moving for summary judgment discussing this claim, Torah Soft and Dr. Spielberg couched their arguments in terms of New York law. However, in answering the motion, Mr. Drosnin relied on Israeli law and submitted a supplemental affidavit by his foreign law expert, Mr. Singer. (Supplemental Affidavit of Foreign Law of Joel Singer dated March 22, 2002 ("Singer Supp.Aff.")). In letters dated April 2, 2002, and May 10, 2002, counsel for Torah Soft asks that the Court strike the answering papers on the ground that Mr. Drosnin failed to give adequate notice of his intent to rely on Israeli law in connection with his counterclaims.

### a. *Notice of Foreign Law*

Rule 44.1 of the Federal Rules of Civil Procedure states in pertinent part that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." The advisory committee notes provide the following guidance:

> The new rule does not attempt to set any definite limit on the party's time for giving the notice of an issue of foreign law; in some cases the issue may not become apparent until the trial, and notice then given may still be reasonable. The stage which the case has reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised, are among the factors which the court should consider in deciding a question of the reasonableness of a notice.

Fed.R.Civ.P. 44.1 advisory committee's note.

■■■ The purpose of Rule 44.1 is to avoid unfair surprise. *See* 9 *Moore's Federal Practice* § 44.1.03[3] (3d ed.1999). Accordingly, notice of the applicability of foreign law that is not served until after a case has been dismissed or when it is on appeal, is generally too late. *See Frietsch v. Refco, Inc.,* 56 F.3d 825, 828 (7th Cir. 1995) (notice provided after dismissal of case); *American International Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 540 (5th Cir.1987) (foreign law raised for first time on appeal). On the other hand, notice provided in the first submission by a party in connection with a motion will usually be adequate because the opposing party still has the opportunity to respond. *Compare Canadian Imperial Bank of Commerce v. Saxony Carpet Co.,* 899 F.Supp. 1248, 1253 (S.D.N.Y.1995) (no-

tice of foreign law in motion papers reasonable) *with Local 875 I.B.T. Pension Fund v. Pollack*, 992 F.Supp. 545, 559 (E.D.N.Y.1998) (not reasonable to raise foreign law for first time in reply papers).

■ In this case, the notice provided by Mr. Drosnin was sufficient. His counsel believed that it was understood that in light of Justice Gammerman's rulings, Israeli law applied to all issues in the case notwithstanding the reference to New York law in the pleadings. In any event, Torah Soft and Dr. Spielberg have suffered no prejudice, as they have availed themselves of the opportunity to reply and have included a further declaration by their expert, addressing Israeli law as it relates to the counterclaims at issue. (Second Declaration of Opher Levenberg of Foreign Law dated April 25, 2002 ("Second Levenberg Decl.")). Accordingly, I decline to strike Mr. Drosnin's answering papers.[6]

b. *Choice of Law*

Israeli law, however, does not necessarily govern the unfair competition claim. Mr. Drosnin seems to assume that, based on Justice Gammerman's prior decision, the entire case must be decided pursuant to the law of Israel. (Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims, at 10 n. 6). That is not correct. In a diversity case such as this, the federal court will apply the choice of law rules of the forum state, in this case New York.

See *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Lazard Freres & Co. v. Protective Life Insurance Co.*, 108 F.3d 1531, 1538–39 (2d Cir.1997). And, "[u]nder New York law, contract and tort claims are analyzed separately for choice of law purposes." *O'Neill v. JC Penney Life Insurance Co.*, No. CV–97–7467, 1998 WL 661513, at *3 (E.D.N.Y. Aug.6, 1998) (citation omitted); *see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir.1996). Thus, Justice Gammerman's holding with respect to the choice of law governing the contract claims in this action does not dictate the result with respect to a tort claim like unfair competition.[7]

■ Nevertheless, an independent analysis leads to the conclusion that Israeli law does, in fact, control the unfair competition claim. "New York applies an 'interest analysis' to its choice of law, under which the law of the jurisdiction having the greatest interest in the litigation controls." *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 967 (2d Cir.1997) (citations omitted); *see also Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998). In a tort case, the interest of each jurisdiction turns primarily on the domiciles of the parties and the locus of the tort. *See Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679 (1985). Furthermore, "[a]s part of the interest analysis, the New York Court of Appeals has distinguished between rules regulating

---

**6.** Mr. Drosnin's counsel, in turn, submitted a letter dated May 2, 2002, seeking to strike Mr. Levenberg's declaration on the grounds that it is merely an argumentative brief and that it raises issues that go beyond those addressed in the moving and answering papers. In the alternative, counsel seeks leave to have her letter considered as a sur-reply. Although Mr. Levenberg did advance new arguments, this is not surprising since it was the first time Torah Soft addressed the counterclaims on the basis of Israeli law. Therefore, I will not strike his expert declaration, but I will consider Mr. Drosnin's sur-reply.

**7.** Justice Gammerman did appear to assume that Iraeli law governs the plaintiff's unfair competition claim against Mr. Drosnin. (Crosby 1/31/02 Aff., Exh. E at 15). However, such a ruling would not control choice of law for Mr. Drosnin's counterclaims.

conduct and rules governing loss allocation. Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies." *AroChem International, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir.1992) (citing *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d at 95–96, 480 N.E.2d 679). Moreover, "when the domiciles of the parties differ, the location of the injury determines the governing substantive law absent special circumstances." *Gray v. Busch Entertainment Corp.*, 886 F.2d 14, 15 (2d Cir.1989) (per curiam); *see also Krock*, 97 F.3d at 646. Here, Mr. Drosnin is domiciled in New York, while Dr. Spielberg and Torah Soft are domiciled in Israel. Further, the law of unfair competition is conduct regulating. *See Fedders Corp. v. Haier America Trading, LLC*, No. 00 Civ. 5583, 2002 WL 519733, at *3 (S.D.N.Y. April 4, 2002). Therefore, the locus of the tort will be the dominant consideration.

The acts of which Mr. Drosnin complains all took place in Israel. It was there that Torah Soft marketed and sold the modified Software with the purportedly false representation that it had been used to write *The Bible Code*. There is no allegation that even a single sale of the Software was made in New York. Accordingly, the law of Israel controls this claim.

  c. *Merits*

■ The Israeli Commercial Torts Law provides that "[a] business person shall neither publish nor cause the publishing of information he knows or should have known is not true regarding the business, profession, asset or service of his or of another business person[.]" Commercial Torts Law, Ch. A, § 2(a). Thus, the deceptive description of goods or services constitutes unfair competition in violation of the Commercial Torts Law. *See* C.A. 5924/97 *On Hatzafon (Weingarten), Ltd. v. Sodapop, Ltd.*, P.D. 53(4) 488, 500–01.

Torah Soft's advertisement proclaimed: "Now Use the Same Program that Michael Drosnin Used to Write *The Bible Code*." (Drosnin 3/22/02 Aff., ¶ 5). Dr. Spielberg and Torah Soft contend that they cannot be liable for unfair competition because this statement is literally true. Dr. Spielberg argues that the Torah Soft product was the only software that Mr. Drosnin relied upon in his research from the summer of 1992 through the summer of 1994, and that it was used to create all ninety-nine print-outs that appear in the book to illustrate Bible Code discoveries. (Declaration of Yochanen Spielberg dated Jan. 30, 2002 ("Spielberg 1/30/02 Decl."), ¶¶ 9, 12). In response, Mr. Drosnin contends that he used the more advanced Bible Code software created by Dr. Rips to write the book and used the Torah Soft program only for "preliminary research" and to print out findings that he had unearthed with the Rips products.

These factual disputes preclude summary judgment. To be sure, ultimate determination will depend to a large extent on a legal analysis of the fair meaning of the advertisement: Does it imply that the Torah Soft program was the only software used to write *The Bible Code?* Can a program utilized to print out illustrations be considered to have been used to "write" the book? Nevertheless, the legal conclusions are closely intertwined with resolution of the factual issues. For example, whether the program contributed to the "writing" of the book will depend to some degree on the extent of the preliminary research that Mr. Drosnin concededly performed with the Torah Soft Software. It would therefore be premature to grant summary judgment on this claim.

  D. *Sanctions*

■ Finally, Torah Soft and Dr. Spielberg seek sanctions against Mr. Drosnin's

counsel pursuant to 28 U.S.C. § 1927 for their failure to withdraw the Second, Third, and Fourth Counterclaims until they were served with the instant motion for summary judgment. The movants argue that Mr. Drosnin's attorneys have long known that these claims were meritless and, when told that a motion would be made to dismiss them, replied that they would vigorously oppose any such motion. According to the movants, by waiting until the eleventh hour to withdraw these claims, counsel for Mr. Drosnin deliberately ran up the costs of this litigation.

Pursuant to § 1927, "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. A finding of bad faith is a prerequisite to imposing sanctions under this sanction. *See Revson v. Cinque & Cinque, P.C.,* 221 F.3d 71, 79 (2d Cir.2000); *Shafii v. British Airways, PLC,* 83 F.3d 566, 571 (2d Cir.1996); *United States v. International Brotherhood of Teamsters,* 948 F.2d 1338, 1345 (2d Cir. 1991) ("Bad faith is the touchstone of an award under this statute"). Bad faith will be found only if the attorney's actions are " 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.' " *Keller v. Mobil Oil Corp.,* 55 F.3d 94, 99 (2d Cir.1995) (quoting *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986)). Accordingly, in order to impose sanctions under § 1927, " 'the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes.' " *Revson,* 221 F.3d at 79 (quoting *Agee v. Paramount Communications Inc.,* 114 F.3d 395, 398 (2d Cir.1997)).

There is no such evidence here. The movants do not contend that the counterclaims at issue were frivolous at the time they were filed when the action was pending in state court. Rather, they argue that as soon as Justice Gammerman issued his findings with respect to the applicability of Israeli law, Mr. Drosnin's attorneys should have known that their claims based on New York statutory law were doomed. But, as discussed above, Justice Gammerman's decision relates primarily to Torah Soft's contract claims, and any tort-based counterclaims would be subject to an independent choice of law analysis.

The movants also maintain that Mr. Drosnin's attorneys could have withdrawn the offending claims well in advance of the close of discovery. However, it was not until discovery was completed that Mr. Drosnin's counsel could be certain that the Software had not been sold in New York. Although the movants argue that sales in this state are not required to establish the statutory claims of false advertising, deceptive trade practices, and unauthorized use of a person's name in advertising, Mr. Drosnin's attorneys can hardly be faulted for concluding that these claims should not be pursued in the complete absence of such sales. They were therefore justified in delaying a decision until they could verify the relevant facts.

Nor is the fact that Mr. Drosnin's attorneys refused earlier demands to withdraw the claims proof of bad faith. Notably, when counsel for Torah Soft and Dr. Spielberg insisted that the counterclaims be dropped, they did not distinguish among the various claims. They did not, for example, argue at that time that the Third, Fourth, and Fifth counterclaims in particular were barred because they were based on New York law and that that law did not apply. (Affirmation of Kenneth David Burrows dated May 2, 2002, ¶ 8). The attorneys for Mr. Drosnin have therefore engaged in no sanctionable conduct.

The cases cited by the movants are inapposite. In *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir.1988), the sanctioned attorney's bad faith was demonstrated by his repeatedly forcing his adversary to make motions to compel discovery, only to comply with the discovery requests at the last minute:

> [O]n three separate occasions defense counsel refused to comply with Apex's reasonable requests for admissions, document production and the identification of Belcher's expert. In each instance, prior to making its motion, Apex's counsel attempted to resolve the matter informally pursuant to Local Rule 6(a) of the Eastern District. And, in each case, the district court found, Apex's counsel was "told to make a motion." After each motion was made, defense counsel "mysteriously," in the district court's words, complied with the requests.

*Id.* at 1020. Similarly, in *Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 708 (2d Cir.1985), sanctions were awarded only after the offending attorney ignored the court's own guidance and advanced frivolous positions. There is no suggestion in the instant case that Mr. Drosnin's counsel either engaged repeatedly in vexatious conduct or disregarded any warnings from this Court.

More to the point is the *Revson* case. There, the district court identified eleven different instances of sanctionable behavior by the attorney, including: (1) threatening to "tarnish" the reputation of opposing counsel and subject him to the "legal equivalent of a proctology exam"; (2) publicly accusing the opposing attorney of fraud; (3) threatening to interfere with other clients of the opposing attorney; (4) threatening to sue opposing counsel individually and seek discovery of his personal finances; and (5) threatening to send the court a letter accusing opposing counsel of criminal conduct. 221 F.3d at 77–78. The Second Circuit, however, found that sanc-

tions under § 1927 were not warranted. *Id.* at 82. As one court subsequently observed:

> [T]he lawyer's extreme language and tactics there sank as close to the threshold of the gutter as imaginable and still escape judicial sanctions. How much lower such conduct could have descended before becoming punishable is difficult to fathom. Suffice it to say that *Revson* sets the low water mark defining the ethical and professional behavior on the part an attorney that passes muster immune from discipline.

*Mathias v. Jacobs*, 167 F.Supp.2d 606, 624 (S.D.N.Y.2001). The conduct of Mr. Drosnin's attorneys here, even if it could be faulted in any respect, would still be far from the threshold that *Revson* establishes for imposing sanctions.

*Conclusion*

For the reasons discussed above, Mr. Drosnin's motion for summary judgment is granted with respect to Torah Soft's claim of breach of contract with respect to any purported agreement to market software jointly with *The Bible Code* and is otherwise denied. The motion of Torah Soft and Dr. Spielberg for summary judgment dismissing the First and Fifth Counterclaims and Third–Party Claims is denied, as is their motion for sanctions.

By October 31, 2002, counsel shall submit a joint pretrial order, proposed voir dire questions, and requested jury instructions.

SO ORDERED.